The State of Iowa v. Gillick.

. THE STATE OF IOWA *v.* GILLICK.

A party was indicted for murder at the May term of the district court, and the cause was then continued until the August term, at which term a new grand jury was impannelled. At the August term, the prosecuting attorney withdrew the indictment, found at the previous term, and procured a new indictment to be found at that term. The defendant moved to quash the second indictment, for the reason that, having been held in custody to answer for a public offense, at the time the grand jury that found the same was impannelled, no opportunity had been allowed him to challenge the said grand jurors. This motion the court sustained, and quashed the indictment. The grand jurors were then brought before the court, that the defendant might exercise his privilege of challenge. C. C., one of the grand jurors, was interrogated by the defendant, as follows : "Have you formed or expressed an unqualified opinion that the prisoner is guilty of the crime with which he is charged ?" to which the juror replied, "I have, of course, but it was in the grand jury room, in the finding of the indictment already quashed." The defendant then moved to discharge the said C. C. from the grand jury, so far as the consideration of the case against him was concerned, which challenge was disallowed by the court. The defendant then proceeded to interrogate the other grand jurors in the same manner, but the court interposed, and refused to permit the questions to be asked, except in the following form : "Have you formed or expressed an unqualified opinion as to the guilt of the prisoner, prior to the time when you were impannelled as a grand juror?" *Held,* 1. That when the grand jury was brought into court, in order that the defendant might exercise his right

of challenge, they stood in the same relation to him as if they had not been impannelled and sworn, and his right of challenge was the same as if he had been permitted to exercise it in the first instance.   2.  That the court erred in overruling the challenge to the juror, C. C.   3.  That the court erred in restricting the interrogatory propounded to the other jurors,

The right of a party charged with an indictable offense, to an impartial grand jury, is as unconditional as his right to any jury whatever.

It is the preconceived opinion, that renders a grand jury incompetent; and not the sources from which that opinion is formed or derived.

Sections 2964 and 2966, of the Code, are directory ; and the fact that their provisions have not been complied with, by the clerk of the district court, in drawing a petit jury, will not amount to error sufficient to reverse a judgment, unless it be shown further, that the court refused to require the directions of the statute to be carried out, or unless it is otherwise shown that some substantial prejudice resulted to the defendant.

And, in such a case, the question should be first made in the district court, on a motion for a new trial, on the overruling of· which, the matter will come more legitimately before the appellate court. ,

On the trial of an indictment for murder, the declarations of the deceased, in the presence of the defendant, are admissible in evidence, for the purpose of showing his conduct and behavior, when charged with causing the injury done to the deceased.

Before declarations can be admitted in evidence, as dying declarations of the deceased, the deceased must be shown to have been conscious of the peril of his situation, and believed that his death was impending.

It is sufficient, however, if it appear in any mode, that the declarations were made under a sense of impending danger, as from the nature of the wound, or the conduct of the deceased, or other circumstances of the case ; and it is not necessary that the deceased should have expressed any apprehension of danger.

Where on the trial of an indictment for murder, charging the defendant with the murder of his wife, a witness testified as follows :  " That hearing the report of a pistol, and understanding that a woman was shot ; he went into the house, and saw the deceased lying on the floor, and the defendant standing over her.   It was not a minute after the report of the pistol.   The deceased was conscious; she appeared to be frightened, and said :  " Take him away—he has murdered me."  The defendant said ·to her, that he was sorry, and appeared to want to help her.   The deceased was shot through the body.   The witness looked around for the weapon with which the deceased was shot, and found a pistol under the bed, that had been freshly fired off.   The deceased said—"that's what did it."   She was shot through the cavity of the chest, and through the liver.   The wound was necessarily mortal.   She frequently called for some one to go for the priest.   The defendant seemed to wish to raise, or assist her.   He appeared to be in a state of bewilderment, and made

The State of Iowa v. Gillick.

no attempt to escape; but when the officers came to take him away, he requested to stay. When the deceased said that he had murdered her, he answered—"Mary, I am sorry for it;" *Held*, That the evidence was admissible.

Malice may be legitimately inferred from the weapon used in the commission of a homicide; and where the killing is with a dangerous weapon, calculated to produce, and actually producing death, in the absence of proof that it was accidental, or upon provocation, the presumption of law is, that the act was voluntary, and with malice aforethought.

Where on the trial of an indictment for murder, the court instructed the jury as follows : " That a man shall be taken to intend that which is the immediate, or necessary, consequence of his acts—as if a man is seen, within shooting distance of another, to raise his gun, take aim, and fire, and the man fall—the ball having inflicted a mortal wound. If these are all the facts proved, the question whether this is murder in the first or second degree, is answered by applying the rule stated above. The taking aim, and firing such a weapon—one from which death would most likely ensue—would, of itself, be *prima facie* evidence that he intended it; and it is, therefore, a wilful, deliberate, and premeditated killing ; *Held*, That the instruction was not erroneous.

Where on the trial of an indictment for murder, the court charged the jury as follows : " The question whether the act of killing was done with deliberation and premeditation, must depend upon four things, viz : 1. The fact that defendant had previously had a difficulty with his wife, when he had been drinking ; 2. The infliction of a fatal wound, with a deadly weapon, in the defendant's hand, without any previous provocation ; 3. The declaration of defendant, made to the witness, W., that he had done what he wanted ; and 4. The declarations of the deceased, that she had been murdered by the defendant ; and where the court left it to the jury to decide, whether deliberation and premeditation were inferrible from these facts ; *Held*, 1. That it should have been left to the jury to say, whether the facts were proved ; 2. That it would have been preferrable, also, if the charge had been so framed, as not to lead the jury to conclude, that these were the only facts from which deliberation and premeditation by defendant, might be inferred.

On the trial of an indictment for murder, it is not error to refuse to charge the jury, " that when no motive for the crime appears, it is evidence that the act was the result of sudden heat and passion, rather than of premeditation and deliberation."

In murder, when the unlawful act is shown, unaccompanied by any circumstances justifying the commission of it, it is the presumption of law, that the party committing the act, acted advisedly, and with intent to produce the consequences which ensued; and if the defendant would reduce the offense to manslaughter, the burden of proof is upon him to show the extenuating circumstances.

*Appeal from the Dubuque District Court.*

FRIDAY, DECEMER 10.

MURDER.  At the May term, 1858, of the Dubuque district court, the defendant was indicted for the murder of his wife, by shooting, and at the August term following, was tried, and convicted of murder in the first degree. From that judgment, he now prosecutes this appeal.   The material facts in the case, and the errors assigned, are fully stated in the opinion of the court.

*John L. Harvey*, for the appellant.

I.  The court erred in refusing to discharge Charles Corkery from the grand jury.  The answer of the grand juror, showed that he had formed and expressed, an unqualified opinion, that the defendant was guilty of the crime for which he was held to answer.  This is good cause of challenge, under the third clause of section 2884 of the Code. The only question, then, to be discussed is, whether the fact, which also appeared by his answer, that that opinion had been formed and expressed in the grand jury room, upon the finding of the former indictment, made any difference?  We say, it did not; that we were entitled to an impartial jury, at the time of challenge, and when the fact was ascertained that the juror was not impartial, but had already formed an opinion, positive and unqualified, that the defendant was guilty, it was the defendant's right to have that juror discharged; and the fact that the opinion was expressed in any particular place, or at any particular time, could make no difference.   The state of the juror's mind, at the time of challenge, was the thing to be ascertained, and not the manner in which he had arrived at that state.   And in judgment of law, the having expressed an opinion, is evidence of existing bias,  The statute is positive and unqualified, that the formation, or expression of such an opinion, shall entitle the defendant to

have the juror discharged. And we ask by what right did the court modify the act of the legislature, so as to read, "unless he has formed or expressed that opinion in the grand jury room."

The only ground upon which the court could have refused the challenge, was, that the opinion having been formed upon the legal sworn evidence in the grand jury room, did not disqualify the juror. We have been unable to find any decision directly on this point. The subject of challenges to the grand jury, is discussed in Wharton's Am. Crim. Law, 226, and in 1 Burr's Trial, 7 to 12. Chief Justice MARSHALL allowed challenges to the grand jury, for the same cause that would have excluded a petit juror. See, also, *People* v. *Jewett*, 3 Wend., 314.

The question being, in this case, whether the manner of arriving at the opinion which disqualifies, makes any difference, we may look to analagous cases, where the question has arisen upon a challenge to a petit juror. Here the cases are numerous, and directly in point. The general rule laid down is, that the law attaches the disqualification to the fact of forming an opinion, and does not look beyond, to examine the occasion, or weigh the evidence, on which the opinion was founded. *People* v. *Mather*, 4 Wend., 229 ; *People* v. *Bodine*, 1 Denio, 281 ; *Blake* v. *Millpaugh*, 1 Johns., 316; *Pringle* v.*Hense*, 1 Cowen, 432. There is no distinction as to the grounds of the opinion, formed by the juror of the guilt of the accused, whether it be founded on being an eye witness, or, on hearing the testimony of those who were present at the transaction, or whether it is based upon rumors, reports, and newspaper publications. *Ex parte Vermilyea*, 6 Cow., 555 ; *People* v. *Mather*, 4 Wend., 229.

From the reading of the cases, we draw the conclusion, that the formation of an opinion, from having heard the testimony of witnesses, or other legal evidence, will more certainly exclude a juror, than the formation of an opinion upon rumor, hearsay, or newspaper report. Thus, in Virginia, it is said, that upon a question, whether one called

as a juror in a case of felony, stands indifferent, or not, the general rule is, that one who has formed a decided opinion that the prisoner is guilty, or innocent, whether that opinion be formed on the evidence of witnesses, whose testimony he has heard on a trial, or conversations with witnesses, or common report, is not an indifferent juror; and that it is immaterial whether such an opinion has been expressed. *Armistead* v. *Commonwealth*, 11 Leigh, 657; 1 Robinson, 735; *Brown* v. *Com.*, 11 Leigh, 769.

While it seems that a person who had formed, or expressed, an opinion as to the guilt or innocence of the prisoner, from mere rumor, is not absolutely disqualified as a juror, yet, if he has formed, or expressed that opinion, from what he has heard one say some of the witnesses had told him, he is disqualified, though he himself had not heard any of the witnesses say anything on the subject, and though he say that his opinions were not such as would influence his verdict, but that he would be governed by the evidence. *Nevins* v. *The State*, 13 Smedes & M., 500; *Same* v. *The State*, 13 Ib., 189. In Pennsylvania, on the trial of a civil issue, it was held that a juror was incompetent, who had heard all the evidence on a former trial, and had made up and expressed his opinion on the facts there given in evidence, but who said that his mind was always open to conviction, on another state of facts. *Ironi* v. *Kean*, 14 Serg. & Rawle, 292. In New Hampshire, where jurors have heard the prisoners tried upon another indictment, before another jury, and found guilty, and answered, upon inquiry, that they had formed an opinion of his guilt upon the second indictment, which was pending at the same time, from the evidence which they had heard on the other trial, they were held to be incompetent. *State* v. *Webster*, 13 New H., 491.

Our position is also supported by the well known rule, that one who has sat upon the grand jury that found the indictment, cannot be a petit juror; and one who sat upon a petit jury for the trial of the same party, for the same offense, is disqualified to be a juror a second time. Sup-

pose the juror had answered that he had formed that opinion while acting as a coroner's juror, would he not have been disqualified? And yet it might be said with equal truth, in that case, that he had formed his opinion upon legal testimony, properly produced before him in a judicial proceeding.

II.   The court erred in its refusal to allow the defendant to ask the question of the other grand jurors.   The question was clearly proper under ordinary circumstances. Code, section 2884.   The reason given by the court for the refusal was, that the grand jurors were not bound to disclose what had taken place in the grand jury room.   Admit for the sake of the argument, they were not.   We say we did not ask what they had done in the grand jury room.   The simple question was, " Have you formed or expressed an unqualified opinion, that the prisoner is guilty of the crime for which he is held to answer?"   This question could have been answered, without stating when, where, or how, he had formed or expressed that opinion.   After the question had been answered that he had, if the counsel had asked him where he formed or expressed that opinion, and the juror had objected, the court might have interposed, and refused to compel the juror to answer.   But this was not the case, as appears from the bill of exceptions.

But if we admit that the grand jurors could not be required to answer, if they had formed or expressed the opinion in the grand jury room, still the action of the court was improper; because the court confined the counsel to asking, if they had formed or expressed this opinion prior to the time they were impannelled as grand jurors. The jury were impannelled on the first day of the term, which was the second day of August; the indictment which was quashed, was not presented until the eleventh, and this challenging did not take place until after that. Thus, there was nine whole days, at least, between the time the jury was impannelled and the time they were challenged. It would be fair to presume that the jury were not in session more than eight hours a day of the eight

days.   It appears, then, that there was sixteen hours a day for eight days, and one whole day, (Sunday), during which the jurors might have formed or expressed the opinion outside of the jury room, and at a time when they were not engaged in their official duties; and in a manner and upon evidence which had no connection with their character as grand jurors, whatever.   But all inquiry into these circumstances was precluded by the ruling of the court.

But let us inquire whether the juror were precluded from answering the question, even admitting the opinion to have been formed or expressed in the grand jury room, We think they were not.   At common law, the grand jurors were sworn to keep secret the counsel of the state, their fellows and their own.   Wharton's Am. Crim. Law, 226. Under our Code, this is left out of the oath, and the jurors are not sworn to secrecy.   Code, section 2892.   Section 2909 provides that no grand juror shall be questioned for anything he may say, or any vote he may give in the grand jury room, &c.   This clearly does not mean that no one may ask a question concerning any such matter, but that he cannot be made civilly or criminally liable for anything he may do or say in the jury room.   The language is copied from the constitution of the United States, in regard to the freedom of debate in congress, and has always received the construction we have given to the same language in the Code.   Story on the Constitution, sections 851 and 866.

Section 2907 of the Code, provides, that members of the grand jury must keep secret the proceedings of that body, and the testimony given before them.   It may well be doubted, whether the formation of an opinion is part of the proceedings of the grand jury; it is certainly not part of the testimony given before them.   Admitting, for the sake of the argument, that for a grand juror to state that he had formed an opinion of the guilt of a prisoner, would be a violation of this section, and subject the grand juror to punishment for a misdemeanor, we say the same rule would apply here, which is applied to witnesses who are

asked questions, the answers to which would criminate them. The court will not prevent them from answering, but will inform them of their right to decline answering, if they choose. 1 Greenleaf on Evidence, section 451.

III. Noncompliance with sections 2964 and 2966 of the Code. These provisions of the Code were made to prevent improper practices in the formation of juries; and to make it impossible, as far as the nature of the case would admit, for the officer to exercise any favor in the drawing of the jury. The difference between that pointed out by the Code, and the method adopted, is very apparent. The ballots, instead of being folded so that the names could not be seen, were left open—instead of being placed in a box, having a top or cover, which would prevent the officer seeing the ballots, were placed in a common hat, without top or cover. Thus, the secrecy, which was the object of the statute, is not attained.

To say that the prisoner must show that he was injured by the irregularity, before the court will grant a new trial, is to make the statute nugatory. If the clerk has been guilty of fraud in drawing the jury, it would, in the nature of the case, be almost impossible to show it. We think the rule, at least, ought to be that such an irregularity will *prima facie* entitle the defendant to a new trial, unless the prevailing party show affirmatively that the irregularity was a mere mistake; that there was no fraud in fact; and that the complaining party in fact suffered no injury. And we think it will be found, in every case, in which these irregularities have been held not to vitiate the verdict, that evidence was introduced to show that no fraud in fact existed, and that no injury was done to the losing party.

If these provisions may be disregarded with impunity, the most serious consequences may, and probably will, follow. Suppose a man of wealth is indicted for a capital crime, how easy would it be for him to bribe the clerk to draw a jury, previously purchased, to acquit him, if he may draw the jury in such a way that he sees exactly who he is drawing. In ninety-nine cases out of a hundred, it

would be impossible to show the fraud, as none would probably be able to prove it but those who participated in the crime. It will be said the court will not presume its officers to have done wrong. We say the court will not presume its officers may not do wrong, unless the court will indulge a presumption contrary to all human experience. We say further, the law-makers did presume the officer might do wrong, when they made the very law in question. The law was not made to punish the wrong-doer, but to prevent the possibility of doing it. To preserve the purity of trials by jury, the legislature thought it necessary to enact the law in question. Will the court make it nugatory by its decision?

IV. The court erred in the admission of the declarations of the deceased, as testified to by Dr. Sprague. These declarations were clearly not admissible as dying declarations, as no foundation had been laid. Wharton's Am. Law of Hom, 306, *et seq.* Nor, as part of the *res gestæ*, because they were a narrative of a past occurrence, and not concomitant with the principal transaction. 1 Greenleaf on Evidence, sections 108, 110. Nor, as admissions on the ground of acquiescence in the statements of others. To be admissible on this ground, the statements must be made to the party against whom they are used, and under circumstances such as called for reply, and the circumstances must be such as to exhibit some act of the mind, and amount to voluntary demeanor or conduct of the party. It must also plainly appear that such conduct was fully known, or the language fully understood by the party, before any inference can be drawn from his passiveness, or silence. 1 Greenleaf on Evidence, section 197.

These circumstances did not concur in the case. The declarations were not made to the defendant, but to Dr. Sprague. The circumstances did not show any voluntary acquiescence on the part of the prisoner. It does not appear that the language used and conduct were fully understood by the prisoner; on the contrary, the testimony of Dr.

Sprague shows that the defendant was intoxicated, and in a state of bewilderment.

5. We come now to the erroneous instructions of the court. The principle here laid down is, that a man must be taken to intend that which is the immediate and necessary consequence of his act. And, after giving the illustration in the charge, the court adds: " the taking aim and firing such a weapon—one from which death would most likely ensue—would, itself, be *prima facie* evidence that he intended it, and was, therefore, a wilful, deliberate, and premeditate killing." Two principles are here laid down by the court, both of which are erroneous. The first, that killing with a deadly weapon, is *prima facie* evidence of premeditation and deliberation. It is well settled, in other states, under a law similar to ours, that where the homicide is proved, the presumption is that it is murder in the second degree. If the prosecutor would make it murder in the first degree, he must establish the character of that crime ; and if the prisoner would reduce it to manslaughter, the burden of proof is on him. *Hill's Case*, 2 Grattan, 594 ; *State* v. *Turner*, Wright, 30. If this is correct, the charge of the court is clearly erroneous, for the effect of the instruction clearly is, that, where the homicide is shown to have been done with a deadly weapon, the presumption is that it is murder in the first degree ; but, where it is done with a weapon not necessarily deadly, the presumption is that it is murder in the second degree. The error of the court consists in treating the terms deliberate and premeditated as synonymous with intentional ; and as if the last included in itself the force and meaning of the other two. To hold that a man, who assaults another with with a weapon—a blow from which, in all human probability, will produce death—intended to kill, is undoubtedly correct ; but to hold, from that fact alone, that he had premeditated and deliberated the act, is unphilosophical, and opposed to human experience. A man might well intend to kill, without having deliberated and premeditated the killing. In fact, the use of a weapon not deadly, is often

proof of deliberation and premeditation; as when a child was killed by thrusting a needle upwards through its navel. Wharton Am. Law of Homicide, 321.

The second principle is, that where the act is shown to be intentional, it is therefore deliberate and premeditated. From this the jury might reasonably infer, that where they had found in the mind of the prisoner a specific intent to kill, they need go no farther, because it followed, necessarily, under the instruction of the court, that when the kiling was intentional, it was therefore deliberate and premeditated. Intentional killing is not necessarily deliberate or premeditated, nor even malicious, for the crime may be only manslaughter, though the act be intentional of death. *The State* v. *Hall*, 4 Dev. and Bat., 491 ; *The State* v. *Fouts*, 4 G. Greene, 500. To adopt the principle here laid down, would be to strike out of the statute the words deliberate and premeditated, and to leave only the word wilful, to distinguish murder in the first degree.

Again: the court points out to the jury the four circumstances, which, he says, tend to show deliberation and premeditation. In other words, he tells the jury that each of these four facts is evidence of premeditation and deliberation. We do not object to the court instructing the jury what certain things are evidence of; this, we take to be the legitimate province of the court. Whether there be any evidence, or not, is a question for the court; whether it is sufficient evidence, is a question for the jury. 1 Greenleaf on Evidence, section 49. What we complain of is, that the four circumstances pointed out by the court as evidences of deliberation and premeditation, are not evidence of any such thing. And we claim that if any one of these four is not evidence of those things, there is error in the charge, for which we are entitled to a new trial.

VI. The court erred in its refusal to give the instructions asked for by defendant. The court instructed the jury that the absence of motive may be taken into consideration by the jury, when they come to consider whether the homicide was wilful, premeditated and deliberate, and with

malice aforethought; but refused to instruct, "that when no motive appears, it is evidence that the act was the result of sudden heat and passion, rather than of premeditation and deliberation." What conclusion must the jury have drawn from this refusal? Clearly, either that such absence of motive was evidence of premeditation and deliberation, rather than of sudden heat and passion; or, that it was as much evidence of one as the other. If the latter, there was no propriety in considering it; and the minds of the jurors must have been led to the conclusion that the court considered it evidence of premediation and deliberation. If it is said the jurors could not have come to a conclusion so at war with human experience, we say that that proves conclusively the error of the court, in refusing the instruction asked.

In ascertaining whether the action of the court was correct, two questions are to be considered: 1. Is the absence of motive, evidence that the act was the result of sudden heat and passion, rather than of deliberation and premeditation. 2. If it is, was it the duty of the court so to instruct the jury? In answer to the first, we say it is always a matter of the greatest importance for the state to show that a motive existed for the perpetration of the crime. In Wharton's Am. Cr. Law, 292, it is said: "On an indictment for murder, former attempts of the defendant to assassinate the deceased, are admissible in evidence. So are former menaces of the defendant, or expressions of vindictive feeling towards the deceased, or, in fact, the existence of any motive likely to instigate him to the commission of the offense in question." "Evidence of previous malice is admissible, to show the *quo animo*, or perhaps to lend to circumstantial evidence a motive." Ib., 293. In Starkie on Evidence, 949, it is said, "that the materials from which the jury are to draw their conclusions as to such an intention, are, among other things, the motives by which he was probably influenced," &c. The effect which the non-existence of a motive has upon the mind, in arriving at the intent, is shown by the expression, of every day

occurrence :  " I can't believe he intended to do it, because he had no motive for the act."

Take an example :  In the *Webster Case*, the state was permitted to show, as a motive for the crime, that the defendant was indebted to the deceased; and that he was in straightened circumstances, so that the destruction of the evidences of debt, in the possession of the deceased, was, to him, an object of great importance. After the motive appeared, how much more easily the mind came to the conclusion that Webster had planned and designed the death of Parkman, than before that motive was known to exist. Nay, had no motive appeared, it would have been impossible, under the circumstances of that case, to have believed that Webster deliberated and premeditated the death of his victim. . See *The State* v. *Watkins*, 9 Conn., 47 ; *Sumner* v. *The State*, 5 Blackford, 580.

. Was it the duty of the court to .so instruct the jury ? The court, in this case, found no difficulty in instructing the jury that certain things were evidence of the existence of the ingredients necessary to constitute murder in the first degree.  Why, then, should the court refuse to instruct them that other things were evidence of the absence of these ingredients.  " It is the province of the court to decide whether certain things are evidence ; whether the evidence is sufficient, is for the jury."  1 Greenleaf, section 49.   That the court must decide what a certain thing is evidence of, is shown by the constant practice of courts rejecting certain testimony as irrelevant to the issue.   In the *State* v. *Watkins*, 9 Conn., 47, it is said : " it is for the judge to instruct as to the application of the evidence."

*P. Myers*, (for the Atty. General), for the State.

I.   The first assignment of error on the part of defendant is, the refusal of the the court to discharge Charles Corkery from the grand jury.  It appears from the record, that a motion to quash a preceding indictment had been sustained by the court below, on the ground that the

defendant had not had an opportunity to challenge the grand jury. And now, Charles Corkery, foreman of the same, being interrogated as to his having formed or expressed an opinion, replied that he had, but it was only in the grand jury room. The presumption is, that it was from legal information there given, and which could not give the bias requisite to disqualify him from sitting. It is only against unfair bias, or prejudice, that our Code, (section 2884), is intended to guard. Besides, section 2920 of the Code, covers and cures, were it necessary, the point above raised. And it further does not appear, that any objection to said Corkery would, or could, have been made, had he been challenged regularly before the finding of the former indictment.

II.   The second assignment of error is, the refusal of the court to allow the defendant to question the other grand jurors. This is not true—they were allowed to be questioned. The record shows the court permitted them to be questioned, but under a certain modification, to reach the peculiar position of this case. The grand jury being precisely the same which found the indictment that had just been quashed, we say the only thing substantially to be ascertained was, whether they were biased, or had formed or expressed an unqualified opinion, previous to their impannelling—was this done ? It was. The defendant was now permitted to challenge with the same force as he could have done on the previous occasion, and no objection, we contend, should have prevailed, other than what would have prevailed in the former instance. But it does not appear that any good objection would, or could have been made to any of the jurors, had they been challenged in the former instance. In fact, if the motion to quash the former indictment had not been sustained at all, provided the prisoner had been allowed to come in, and cure the oversight, by challenging when it was discovered, wherein would his rights have been prejudiced ? Besides, is the time of challenging immutably fixed by our Code ?

. It is very proper that it should generally be done before impannelling, and it would seem that the court, by sustaining the motion to quash the former indictment, and allowing defendant every advantage against the same grand jury, that he could have availed himself of then, showed him every fair and reasonable chance he could, in justice, ask. Defendant having been in no manner injured, nor his rights prejudiced, this court is not called upon to interfere. The citations of counsel to sustain the above assignment of error, are not in point, relating as they do to challenges of petit jurors, with one or two exceptions, which do not at all touch a case like this. Besides, is there not a reasonable distinction to be made, and does not the public welfare and policy require, that a more strict procedure be applied to impannelling petit juries, than in the preliminary matters of indicting? The whole matter may be further covered and cured, if any cure were necessary, by section 2920 of the Code, inasmuch as herein was virtually a matter of form, and defendant's rights do not appear to have been, in any manner, prejudiced by the action of the court.

III. The third assignment of error is, "non-compliance with sections 2964 and 2966 of the Code." Section 2964, regarding the folding of ballots, and depositing them in a box to be kept for that purpose, is really only directory; as, also, section 2966, in relation to shaking, intermingling, and drawing them. The record, also, does not show that any objection was made on this point, in the court below, and this court will not regard an objection for the first time taken here. Besides, there is no claim, nor evidence, that there was any fraud, or unfairness, on the part of the district clerk, nor of any other person, in the matter; and being a thing of form, whereby defendant does not appear to have been injured, may it not be regarded, also, as covered by section 2920 of the Code. If the doctrine claimed by defendant's counsel prevail, would it not set aside the verdicts in the vast majority of jury causes tried in this state.

IV. The fourth assignment of error is, the admission as evidence of the declarations of the deceased, as testified to by Dr. Sprague. Dr. Sprague testified that he thought it was not more than a minute after hearing the pistol report, before he entered the room, and saw the woman, and her declaration seems to have immediately followed. Were they not properly admissible? On this point, we refer the court to 2 Grattan, 605; *Rex* v. *Foster*, 25 Eng. Com. Law, 421; and the note there referring to the holding of Lord HOLT, in the case of *Thompson et ux.* v. *Trevaunion*, Skin., 402. Ought not the declaration of the deceased in the case at bar, be equally admitted as a part of the *res gestæ?* No time had elapsed sufficient for her to fabricate a story—no *lis mota* appears—nor could deceased be supposed to have concocted declarations for her own advantage.

V. The fifth error assigned is, that the court erred in instructing the jury. This assignment is certainly quite indefinite, if not vague. However, we submit, whether the court erred as claimed by defendant, in citing with approbation the language in *Hill's Case*, 2 Grattan, 594, viz: that the rule of law is, that " a man shall be taken to intend that which is the immediate, or necessary consequence of his act;" and "that the aiming and firing a deadly weapon at deceased, would be *prima facie* evidence that the slayer intended the act, and that it was, therefore, a wilful, deliberate and premeditated killing." It might not be conclusive evidence of malice aforethought, but would certainly indicate a preconceived and resolved on killing—a malice. The effect of the above instructions of the court, would be merely to throw upon the defendant the burden of showing some extenuating circumstances, which certainly are not brought forward in this case. 2 Grattan, 607; 6 Blackf., 311.

As to the remaining objection of counsel under this head, we must say, the counsel has certainly mistaken the meaning of the court. The court did not there charge, as claimed by counsel in his argument. The court

having first said that " the premeditation required by the law, not being manifested by the proof, as to the act of killing, do any other facts in the case make it sufficiently manifest?" and then proceeds to say : "The question whether the act of killing was done with deliberation and premeditation, must depend on four things," which he then sets forth.   The court evidently means, that if such pre-meditation be manifested at all, it must be from the pre-ceding facts; and the court immediately goes on to say, that, " I leave it as a question for you to decide, whether deliberation and premeditation are inferrible from these." And the court further added, that all the declarations of deceased are to be taken together; her declaration about rum having been the cause of the deed, as well as what she said about having been murdered.

VI.   The sixth error assigned is, the refusal of the court to give the instructions asked for by the defendant.   The record shows that only one instruction was asked for, and that was given, with the exception of the last clause, which is, "that when no motive appears, it is evidence that the act was the result of sudden heat and passion, rather than of premeditation and deliberation."   The court having al-ready instructed the jury, "that the absence of motive might be taken into consideration by them, when they came to consider whether the homicide was wilful, delib-erate and premeditated, and with malice aforethought," it would seem that they were sufficiently instructed on that point, and that the force of the absence of motive, was properly left in the hands of the jury to measure.

STOCKTON, J.—At the May term, 1858, of the district court of Dubuque county, the defendant was indicted for the murder of his wife, Mary Gillick.   The cause was con-tinued until the next term, in August, at which time a new grand jury was impannelled.   After the impannelling of the same, the prosecuting attorney withdrew the indict-ment found at the previous term, and procured a new in-

dictment, to be found by the grand jury at the said August term. The defendant moved to quash this second indictment, for the reason that, having been held in custody to answer for a public offense, at the time the grand jury that found the same was impannelled, no opportunity was allowed him to challenge the said grand jurors. The court sustained the motion, and the indictment was quashed.

The grand jurors were then brought before the court, in order that the defendant might exercise his privilege of challenge. Charles Corkery, one of the grand jurors was interrogated by the defendant, as follows: " Have you formed or expressed an unqualified opinion that the prisoner is guilty of the crime with which he is charged?" The juror replied: " I have, of course; but it was in the grand jury room, in the finding of the indictment already quashed." The defendant then moved the court to discharge the said Corkery from the grand jury, so far as the consideration of the charge against the defendant was concerned. The challenge was disallowed by the court. The defendant proceeded to interrogate the other grand jurors, in the same manner, but the court interposed, and refused to permit the questions to be asked, except in the following form: " Have you formed or expressed an unqualified opinion as to the guilt of the prisoner, prior to the time which you were impannelled as a grand juror?"

The first error assigned is, the disallowing the defendant's challenge of the juror, Corkery.

The authorities are not numerous as to what will constitute good cause of challenge to a grand juror. On the trial of Aaron Burr, C. J. MARSHALL allowed a challenge to a grand juror, for the same cause that would have constituted a good objection to a petit juror. 1 Burr's Trial, 38. Taking this as the rule, there can be no doubt but that the challenge, in this case, should have been allowed.

The rule of law is, says Lord COKE, that the juror must stand indifferent, as he stands unsworn. Co. Litt., 155 b. A juror cannot be impartial, or indifferent, who confesses that, from a knowledge of the facts, he has made up his

VOL. VII.        39

mind that the accused is guilty. He cannot be supposed to stand impartial, merely because he has no malice or ill will against the defendant, or because he has not formed his opinion from rumor. If the least bias is sufficient to exclude, the source from which it is derived is not material. It is the same thing to the accused, whether it proceeds from pre-conceived opinions, or from malice or ill will. The defendant is equally affected in either case. *Ex parte Vermilyea*, 6 Cowen, 555.

Among the earlier authorities, we find it said to be good cause of challenge on the part of the prisoner, that the juror has declared his opinion before hand, that the party is guilty, or will be hanged, or the like. Hawkins, B. 2, chap. 43, sec. 28. Hawkins adds: "Yet it hath been adjudged, that if it shall appear that the juror shall have made such declaration from his knowledge of the cause, and not out of any ill-will to the party, it is no cause of challenge." If a juror says he will pass for one party, because he knows the verity of the matter, it was formerly no cause of challenge. It is now conceded, says MARCY, J., that if the opinion of the juror be founded on a knowledge of the facts, or on information derived immediately from those acquainted threrewith, it constitutes a good objection to him. If in any case it would be safe to admit a juryman, who had formed and expressed an opinion, the presumption of fairness and impartiality would certainly be stronger in favor of him who founds his belief on authenticated facts, than to him who has given credence to vague and groundless rumors. *The People* v. *Mather*, 4 Wend., 229. If it be said, says MARSHALL, C. J., in the trial of Burr, that the juror has made up his opinion, but has not heard the testimony, such an excuse only makes the case worse, for if the man has decided on insufficient testimony, it manifests a bias that completely disqualifies him from the functions of a juryman. 1 Burr's Trial, 370.

The disqualifying bias which the law regards, is one which, in a measure, operates unconsciously on the juryman, and leads him to indulge his own feelings, when he

thinks he is influenced entirely by the weight of evidence. 1 Chit. Crim. Law, 443 ; Bacon's Abr. Title Jury, (E.), 5.

Though the juror is sincerely determined to discard his prejudices, he is not to be received, because the law does not hold him capable of doing so. He will listen, says MARSHALL, C. J., with more favor to that testimony which confirms, than to that which would change his opinion. It is not to be expected that he would weigh testimony or argument, as a man whose judgment is not made up in the case. In Pennsylvania, it has been been held, that a defendant confined in jail on a charge of homicide, may be allowed to challenge a grand juror for favor, after the grand jury were sworn. *Commonwealth* v. *Clarke*, 2 Brown, 325.

It is no sufficient answer to the prisoner's challenge to Corkery, that his opinion had been formed from the evidence given before him as a grand juror, upon which the second indictment was found. The first indictment against the defendant was set aside, and the second one found without his knowledge. He had not been allowed his privilege of challenging the grand jurors, at the time they were called into the jury box to be sworn. This was a right the law accorded to him ; and when the jury were brought into court, in order that he might exercise this right, they stood in the same relation to him, as if they had not been impannelled and sworn. His right of challenge was the same as if he had been permitted to exercise it in the first instance. The jurors must stand indifferent to him, as they stand unsworn. His right to an impartial jury is as unconditional as his right to any jury at all. *Ex parte Vermilyea*, 6 Cowen, 562.

The juror challenged was as much disqualified from taking any part in the consideration of the charge against the defendant, by reason of the opinion formed by him from the evidence given under oath in the grand jury room, and by his action there on, as if that opinion had been formed from rumor, or had been induced by malice or ill-will. It is the preconceived opinion that ren-

ders him incompetent, and not the sources from which that opinion is formed or derived. A juror who has formed or expressed an opinion, is set aside, because he is supposed not to be indifferent to the result of the matter to be tried. Such an opinion, in the presumption of law, is not less the effect of partiality and prejudice operating on the mind of the juror, than it is the efficient agent to produce such partiality and prejudice on his mind, perhaps without his consciousness.

II.   This conclusion disposes of the matter embraced in the second assignment of error, wherein it is alleged that the district court refused to permit the defendant to interrogate the grand jurors, except as to any opinion formed or expressed by them as to the guilt of the accused, prior to their being impanelled as grand jurors. In this, also, there was error.

III.   The third assignment of error is based upon the fact, shown by the record, that the clerk, in preparing ballots containing the names of the jurors, placed the same, not being folded, in a hat, without top or cover, from which the said ballots were drawn, and not from a box to be kept for that purpose, as required by law. Code, sections 2964, 2966.

We think that sufficient is not shown by the record to amount to substantial error. The statute is directory; and the fact that its provisions have not been pursued by the clerk in drawing the jury, will not amount to error sufficient to reverse the judgment, unless it is shown further, that on application to the court, and its attention being called to the mode of proceeding by the clerk, it had refused to require the directions of the statute to be carried out; or, unless it was otherwise shown that some substantial prejudice had resulted to the defendant. And, even when this is shown, it is always better that the question should be first made to the district court, on motion for a new trial. On the overruling of which, the matter will come more legitimately before this court for consideration.

IV.   The fourth assignment of error relates to the evi-

dence of the witness, Dr. Sprague. It is urged by the defence that the evidence was not proper to be given to the jury, either as the dying declarations of the deceased, nor as part of the *res gestæ*.

The witness testified, that hearing the report of a pistol, and understanding that a woman was shot, he went into the house, and saw the deceased lying on the floor, and the defendant standing over her. It was not a minute after the report of the pistol. The deceased was conscious; she appeared to be frightened, and said : " take him away—he has murdered me." The defendant said to her that he was sorry, and appeared to want to help her. The witness, on examination, found she was shot through the body. He looked around for the weapon with which the deceased was shot, and found a pistol under the bed, that had been freshly fired off. The deceased said, " that's what did it." She was shot through the cavity of the chest, and through the liver. The wound was necessarily mortal. She frequently called for some one to go for the priest. The defendant seemed to wish to raise, or assist her. He appeared to be in a state of bewilderment, and made no attempt to escape; but, when the officers came to take him away, he requested to stay. When the deceased said he had murdered her, he answered, " Mary, I am sorry for it."

We think this evidence was proper to be given to the jury. It was admissible as the declarations of the deceased, made in the presence of the defendant, for the purpose of showing his conduct and behavior, when charged with causing the injury done to deceased. The jury, in such case, may fairly be allowed to judge whether what the defendant said in reply, was an admission of the charge made by his wife.

Before the evidence was allowed to be given to the jury, as the dying declarations of the deceased, it was necessary that the court should first be satisfied that they were made under a sense of impending death. The deceased must be shown to have been conscious of the peril of her situation, and believed that her death was impending. The

declarations must be made in the full belief that she could not recover. It is enough, if it satisfactorily appear, in any mode, that the declarations are made under a sense of impending death. It may be proved, by her evident danger, or from her conduct, or other circumstances of the case —all of which are resorted to, in order to ascertain the state of the declarant's mind. 1 Greenleaf's Ev., section 158, *The State* v. *Nash & Redout, post.* The conscious- ness of death may be inferred from the nature of the wound, or state of illness, or other circumstances of the case, although the deceased should not have expressed any apprehension of danger. . *Commonwealth* v. *Murray*, 2 Ashm., 41; *same* v. *Williams*, Ib., 69; *Anthony* v. *The State*, 1 Meigs, 265; *McLean* v. *The State*, 16 Alab. 672. This restriction, it should be observed, only applies where the declarations are offered on the sole ground that they are made by a person *in extremis*, for, where they consti- tute a part of the *res gestæ*, or come within the exception of declarations against interest, or the like, they are admis- sible, as in other cases, irrespective of the fact that the de- clarant was under apprehension of death. 1 Greenleaf Ev., section 156.

. In *Hill's Case*, 2 Grattan, 594, the question is asked by the court, but not decided, whether declarations made by the deceased, immediately after the wound was inflicted, and before he has had time to fabricate a story, and when the *lis mota* did not exist, might not be given in evidence as part of the *res gestæ*. The same question arose in *Rex* v. *Foster*, 6 C. and P., 325. The prisoner was charged with manslaughter, in killing the deceased by driving a cabriolet over him. A witness was called, who said that he did not see the accident, but immediately after, on hear- ing the deceased groan, he went up to him and asked him what was the matter. It was objected, that what the de- ceased said, in the absence of the prisoner, as to the cause of the accident, was not receivable in evidence. The court held, that what the deceased said at the instant, as to the cause of the accident, was clearly admissible. It was the

best possible testimony that, under the circumstances, could be adduced to show what it was knocked the deceased down. See, also, *Aveson* v. *Kinnaird*, 6 East., 193; *Thompson* v. *Trevannian*, Skinner, 402; *Commonwealth* v. *McPike*, 3 Cushing, 181.

V.   The court charged the jury that, "a man shall be taken to intend that which is the immediate or necessary consequence of his acts—as if a man was seen, within shooting distance of another, to raise his gun and take aim, and fire, and the man falls, the ball having inflicted a mortal wound; if these are all the facts proved, the question whether this is murder in the first or second degree, is answered by applying the rule stated above.   The taking aim, and firing such a weapon—one from which death would most likely ensue—would, of itself, be *prima facie* evidence that he intended it; and it is therefore a wilful, deliberate, and premeditated killing."   It is claimed by the defendant, that this instruction was erroneous.

The rule of law has long been settled, that a person who does an act wilfully, necessarily intends that which must be the consequence of his act.   *Rex* v. *Farrington*, Russ & R., 207; *Rex* v. *Dixon*, 3 M. & S., 15; *Com.* v. *Drew*, 4 Mass., 391; Wharton's Crim. Law, 232, 268, 359; 2 Russell on Crimes, 231.   Malice is legitimately inferred from the weapon used; and where the killing is with a dangerous weapon, calculated to produce, and actually producing death, in the absence of proof that it was accidental, or upon provocation, the presumption of law is, that the act was voluntary, and with malice aforethought.   *U. S.* v. *McGlue*, 1 Curtis C. C., 1; *Oliver* v. *State*, 17 Ala., 587.   In Ohio, where a homicide is proved, it was held that the presumption of law was, that it was murder in the second degree.   Wright's O., 20.   Such was held to be the law in Virginia, in *Hill's Case*, 2 Grattan, 594.

Murder in the first degree, under our statute is, that which is perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate, or premeditated killing, or which is committed in the perpetration of, or

attempt to perpetrate, any arson, rape, robbery, mayhem, or burglary. Code, section 2569. The same distinction has been adopted by other states of the union. The practical working of the statute, (says Wharton), has been to divide murder, as limited by the common law, into two classes, leaving the original boundaries between murder and manslaughter unaltered. The statute requiring murder in the first degree, to be deliberate, it has been held, did not change the common law doctrine in that respect, with regard to murder ; the degree of deliberation requisite in both cases, being the same. The distinctive peculiarity attached by the statute to murder in the first degree, however, is, that it must necessarily be accompanied with a premeditated intention to take life. The "killing" must be premeditated. Wherever, then, in cases of deliberate homicide, there is a specific intention to take life, the offense, if consummated, is murder in the first degree ; if there is not a specific intention to take life, it is murder in the second degree. Wharton's Am. Crim. Law, 420 ; 4 Penn. Law Journal, 156.

In *Republica* v. *Mulatto Bob*, 4 Dallas, 145, the change made by the law of Pennsylvania, was examined by McKean, C. J. It has been objected, he says, that the amendment of our penal code, renders premeditation an indespensable ingredient to constitute murder in the first degree. But still, it must be allowed, that the intention remains, as much as ever, the true criterion of crimes, in law, as well as in ethics ; and the intention of the party can only be collected from his words and actions.

In New Jersey, the same construction has been placed upon the law of that state. In the case of *State* v. *Spencer*, 1 Zabriskie, 196, C. J. Hornblower, remarks : "The statute does not alter the law of murder, in the least respect. What was murder before its passage, is murder now. What is murder now, was murder before the statute passed. It has only changed the punishment of the murderer in certain cases. The law of murder is the same." "The premeditation, or intent to kill, need not

be for a day, or an hour, nor even for a minute.    For if the jury believe there was a design of determination to kill, distinctly formed in the mind, at any moment before, or at the time the pistol was fired, or the blow was struck, it was a willful, deliberate, and premeditated killing, and murder in the first degree."

In *Bivens* v. *The State*, 6 English, 455, it was held, that the premeditation must exist before the act of killing; and where the killing was with a deadly weapon, it was *prima facie* evidence that the design to kill, was formed in the mind of the party committing the act, and that the killing was the consequence of such design.

If the malice is to be inferred from the weapon used, the taking aim and firing with a weapon, from which death was likely to ensue, may well be said to furnish evidence of intent, in addition to the malice; and in this view, we think the instruction given, is sustained by authority.    1 Leigh, (Va.), 598.

We come next to that part of the charge of the court, in which the jury are directed that, " the question whether the act of killing was done with deliberation and premeditation, must depend upon the following facts:

1.   The fact that the defendant had previously had a difficulty with his wife, when he had been drinking; 2. The infliction of a fatal wound with a deadly weapon, in the defendant's previous possession, without any provocation.   3.   The declaration of defendant, made to the witness, Wall, that he had done what he wanted; and 4. The declaration of the deceased, that she had been murdered by the defendant.

The question was left to the jury to decide, whether deliberation and premeditation were inferrible from these facts.   If the charge of the court is to be understood as assuming these facts to be proved, we think the court erred in so assuming, and in directing the jury what inferences might be drawn from them, as proved.   It should have been left to the jury to say, whether the facts were

proved. There would have been no error in directing them, that if they judged that such and such facts were proved, they were at liberty to draw the legitimate inferences from them. It would have been preferrable, also, if the charge had been so framed, as that the jury might not be led by it to conclude, that these were the only facts from which deliberation and premeditation by defendant, may be inferred.

VI. The court, at the request of defendant, charged the jury: "That although it is not necessary for the state to show a motive for the crime, yet the absence of a motive may be taken into consideration by the jury, when they come to consider whether the homicide was wilful, premeditated, deliberate, and with malice aforethought." It refused, however, to charge further, "that when no motive appears, it is evidence that the act was the result of sudden heat and passion, rather than of premeditation and deliberation." And this is the sixth error assigned by defendant.

We think there was no error in the refusal of this part of the instruction. The part given was sufficiently favorable to the defendant. The unlawful act being shown, unaccompanied by any circumstances justifying the commission of it, it is the presumption of law, that he has acted advisedly, and with intent to produce the consequences which have ensued. *Rex* v. *Dixon*, 3 M. &. S., 15. In every charge of murder, says Mr. Justice FOSTER, the fact of killing being first proved, all circumstances of accident, necessity, or infirmity, are to be satifactorily proved by the prisoner, unless they arise out of the evidence produced against him; for the law presumes the fact to be founded in malice, until the contrary appears. Foster, 255; 1 Hale P. C., 455; *Com.* v. *York*, 9 Met., 93. If the defendant would reduce the offense to manslaughter, the burden of proof is on him to show the extenuating circumstances. *Hill's Case*, 2 Grattan, 594; *State* v. *Turner*, Wright's O., 20.

VII.   The seventh and eighth errors assigned, refer to the action of the district court, in receiving the verdict of the jury, in the absence of the prisoner's counsel, and in overruling a motion for a new trial.  As the judgment will be reversed, and a new trial awarded, the necessity for any decision by us on the question raised, is obviated.

Judgment reversed.