IN THE COURT OF APPEALS OF IOWA
No. 15-0871
Filed August 17, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JOHN DAVID GREEN,**
        Defendant-Appellant.

_____


Appeal from the Iowa District Court for Sac County, Gary L. McMinimee, Judge.


An appellant appeals his conviction by jury trial of the offense of murder in the second degree. **AFFIRMED.**


Mark C. Smith, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.


Considered by Vaitheswaran, P.J., Tabor, J., and Goodhue, S.J.

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**GOODHUE, Senior Judge.**

John David Green appeals his conviction of murder in the second degree following a jury trial.

**I. Background Facts and Proceeding.**

Mark Koster moved to Sac City and purchased a house there sometime between 1999 and 2000. In July 2009, Koster's mailbox was discovered filled with unopened mail, and his utility bills had not been paid for some time. When Sac City Police Chief John Thomsen checked on Koster's welfare, he found the house locked and a note on the door stating, "[G]one to Florida with Tom for the winter. See you in the spring, Mark." The note gave a telephone number of a resort in Florida, which Chief Thomsen called, but the resort had no record of Koster.

Koster did not return in the spring. In May 2010, Koster was listed as a missing person, and a search warrant for the house was obtained. Koster's car was in the garage, the house was in order and tidy, the refrigerator was empty, and the dresser was full of clothes, but Koster was nowhere to be found. Koster's family filed a petition to have him declared dead, and the house was sold to Wesley Galeson. In November 2012, Galeson was cleaning the basement when he discovered a body under a pile of rubbish and kitty litter. Chief Thomsen and Assistant Chief Mark Jansma investigated and discovered a mummified body wrapped in a blanket. Dental x-rays were used to identify the body as Koster. An autopsy revealed the hyoid bone (neck bone) and thyroid cartilage (Adam's apple) were fractured. A criminologist from the Iowa Division

of Criminal Investigation searched the scene for forensic evidence, but no identifiable fingerprints or DNA was recovered.

Sandra Dierenfeld, a neighbor of Koster, advised the authorities that a few weeks before he disappeared, Koster had been living with a man she had known only as Tom, as well as Tom's dog. The authorities discovered Koster had a friend by the name of Thomas Falke, who was living in Kansas City. Officers went to Kansas City to interview him, but Falke's employment records indicated he could not have been living in Iowa in the spring and early summer of 2009. Falke identified John David Green as someone they should talk to.

Pictures of Green and his dog were obtained. Dierenfeld thought the pictures showed the man that had been living with Koster in 2009-2010, and she was more certain the pictures of the dog showed the dog she had seen at Koster's home. After locating Green in Florida, authorities—including Sac County Attorney Ben Smith—traveled there to question him. The Iowa authorities, accompanied by Florida law enforcement, went to the camper Green was living in with his dog. Green then voluntarily went to the local sheriff's office for an interview. Although Green was not advised of his *Miranda* rights, the door to the interview room was unlocked, Green was told he could leave at any time, and the interview was not confrontational.

In the interview Green initially denied he had been in Iowa, but he eventually admitted he had been living with Koster in Sac City. He stated he had known Koster since 1985, and they had periodically worked together and lived in the same residence. The version of events he gave in the interview and later in his trial testimony were substantially consistent: Green and Koster were living at

Koster's home in Sac City in the early summer of 2009. Koster had become confrontational and was particularly upset with his father. Koster had attacked Green with a baseball bat. The two fell to the floor, and Green held the bat against Koster's throat until he died. Green took Koster's wallet containing fifty-six dollars and his identification, and took Koster's body to the basement where he covered it with kitty litter and other debris. He tidied up the house, wrote the note that he attached to the door, and left. Green claimed he failed to report Koster's death to law enforcement because he knew no one in the area and assumed his claim that he had acted in self-defense would not be believed.

During Green's interview, the police chief and assistant chief intermittently consulted with the Sac County Attorney, who audited the interview from another room. After the interview, Green was taken back to his camper by an officer. Green consented to the search of the camper, but nothing incriminating was found. The officers were notified charges were going to be filed, and accordingly, Green was placed under arrest and was charged with first-degree murder. The medical examiner reevaluated Koster's remains and determined that his death was caused by strangulation consistent with a straight, hard object being pressed against his neck.

Green filed a motion to suppress the Florida interview under the Sixth Amendment of the United States Constitution and article 1, section 10 of the Iowa Constitution. The motion expressly put forth the contention that the right to counsel attached when the prosecutorial forces focused on him. The trial court's ruling and counsel's arguments centered on custody or other deprivation of freedom of action as the triggering event of the right to counsel under the Fifth

Amendment. The motion was denied, and the results of the Florida interview were admitted into evidence.

At trial, Green argued he acted in self-defense. The jury found him guilty of murder in the second degree, and he was sentenced to confinement for an indeterminate term of no more than fifty years. Green filed a timely notice of appeal.

## II. Attachment of Right to Counsel.

Green first contends the trial court erred in denying his motion to suppress the statements he made during his interview in Florida because he was the primary subject of prosecutorial focus at the time of the interview. He argues that his right to counsel was triggered by the prosecutorial focus and apparently contends that law enforcement had an obligation to advise him of his right to counsel, which they failed to do.

### A. Error Preservation

Generally, the denial of a motion to suppress is adequate to preserve error as to the issue raised in the motion. *State v. Lovig*, 675 N.W.2d 557, 562 (Iowa 2004). The State concedes Green raised the violation of the Sixth Amendment to the United States Constitution in his motion to suppress but contends Green did not raise, and the trial court did not rule on, the applicability of article 1, section 10 of the Iowa Constitution.

When there are parallel constitutional provisions in the federal and state constitutions and a party does not indicate the specific constitutional violation of both constitutions, we generally regard both claims to be preserved. *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011). Furthermore, in his written motion to

suppress, Green specifically referred to article 1, section 10 of the Iowa Constitution and the right to counsel as it relates to situations where prosecutorial forces are focused on a particular defendant. Error has been preserved.

## B. Standard of Review

When constitutional issues are involved, our review is de novo. *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015). We give deference to the trial court's findings, though we are not bound by them. *Id.* at 153.

## C. Discussion

The trial court's ruling denying the motion to suppress was primarily concerned with the Fifth Amendment rights implicated by Green's interview. That issue is not raised in this appeal. The trial court also addressed the Sixth Amendment rights and article 1, section 10 rights by noting that the right to counsel attaches at the time adversarial judicial criminal proceedings are initiated against the persons, whether by way of formal charge, arraignment, preliminary hearing, information, or indictment, citing *State v. Jackson*, 380 N.W.2d 420, 423 (Iowa 1986). Green agrees that *Jackson* is a correct statement of what is necessary to trigger one's right to counsel under the Sixth Amendment. However, he contends that article 1, section 10 of the Iowa Constitution triggers the right to counsel when the prosecution becomes so heavily involved in the case that the accused is confronted by an expert adversary. Green cites no direct authority for his contention.

Green claims that once an accused asserts his right to counsel, the guarantee of article 1, section 10 becomes applicable and that further uncounseled statements are inadmissible unless the accused initiated further

conversation, and knowingly and intelligently waived the right to counsel. *See State v. Newsom*, 414 N.W.2d 354, 359 (Iowa 1987). At no point, however, did Green assert his right to counsel during or prior to the interview. Green is correct in asserting that the filing of an indictment or trial information is the commencement of a felony charge in Iowa. He is also correct that our supreme court has held the right to counsel may attach at a time prior to the filing of a trial information or indictment when a complaint has been filed, a warrant issued, and an arrest made. *See Jackson*, 380 N.W.2d at 423-24; *State v. Johnson*, 318 N.W.2d 417, 434-35 (Iowa 1982). Nothing in either *Jackson* or *Johnson* indicates the right to counsel attaches under Iowa law on the basis of prosecutorial focus and involvement absent some formal, objective action by law enforcement to indicate the results of an investigation support a criminal charge.

We are not constrained to interpret parallel components of the Iowa Constitution and the Federal Constitution in the same manner as interpreted by the federal courts, but we can consider the persuasiveness of the federal court's position. *State v. Young*, 863 N.W.2d 249, 257 (Iowa 2015). The words "in all criminal prosecutions and involving the life or liberty of an individual" are words contained in article 1, section 10 of the Iowa Constitution that do not appear the Sixth Amendment of the United States Constitution. The language cited is the critical difference that creates a right to counsel in a misdemeanor case, while no such right exists under the Sixth Amendment. *See id.* The additional language does not accelerate the attachment of the right to counsel in the manner Green alleges. A criminal "prosecution" does not exist at the investigatory stage. Green has cited no precedent for accelerating the right to counsel or the existence of a

"prosecution" at the pre-complaint, pre-arrest, or pre-custody stage of an investigation.

We affirm the denial of Green's motion to suppress.

### III. Claim of Erroneous Instructions.

Green also challenges two of the jury instructions. Over his objections, the jury was instructed as follows:

**Instruction No. 19**

If a person has the opportunity to deliberate and uses a dangerous weapon against another resulting in death you may but are not required to infer that the weapon was used with malice, malice aforethought, premeditation, and specific intent to kill.

**Instruction No. 20**

A dangerous weapon is any sort of instrument or device which is actually used in such a way as to indicate the user intended to inflict death or serious injury and when so used is capable of inflicting death.

Green contends that the combination of these two instructions erroneously permitted the jury to find malice based on the use of a dangerous weapon, regardless of whether the facts supported such a finding. According to Green, doing so allowed the jury to find malice aforethought "without proof beyond a reasonable doubt," in violation of the Fourteenth Amendment of the United States Constitution and article 1, section 19 of the Iowa Constitution.

### A. Error Preservation

Green specifically cites to *State v. Ambrose*, 861 N.W.2d 550 (Iowa 2015), in challenging the jury instruction, emphasizing the fact that Koster brought the alleged dangerous weapon to the fracas rather than him. In *Ambrose*, our supreme court recited a hypothetical situation very similar to the facts as alleged

by Green and cautioned that care should be used in instructing the jury on the malice inference. 861 N.W.2d at 560. As in *Ambrose*, Green argues the inference instruction amounted to an unfair comment on the evidence by the court. *See id.* Given the reference to *Ambrose* and the hypothetical it used, the court and the State were adequately put on notice of Green's objection to the inference instruction and the reasons for the objection.

Green also alleged ineffective assistance of counsel, which is an exception to the ordinary rules of error preservation. *Id.* at 555. We believe, however, error was preserved, independent of the claim of ineffective assistance of counsel.

### B. Standard of Review

Challenges to jury instructions are reviewed for corrections of law. *State v. Heemstra*, 721 N.W.2d 549, 553 (Iowa 2006). To the extent constitutional grounds are involved, our review is de novo. *Id.* Green objects to allowing the jury to infer malice aforethought by the use of a deadly weapon.

### C. Discussion

Green relies almost exclusively on the language contained in *Ambrose*, a first-degree-murder case in which the court used inference instructions similar the ones at issue. 861 N.W.2d at 554. In reviewing the propriety of instructing the jury on malice inference in that case, the supreme court discussed the following hypothetical situation:

> A is involved in a fight with B. A is winning the fight and has knocked B to the ground. B picks up a rock and strikes A. A dies as a result of being struck with the rock. B is charged with murder. The rock is argued to be a dangerous weapon because it is an instrument which is used in a manner as to indicate the defendant

intends to inflict death or serious injury and is capable of inflicting death or serious injury. Using the inference instruction the prosecution is free to argue and the jury to conclude that B was acting with "malice aforethought" even though there is no evidence of spite, hatred, or ill will.

*Id.* at 560 (quoting 4 Robert R. Rigg, *Iowa Practice Series Criminal Law* § 3:5 at 87-88 (2014-2015 ed.)). The court noted,

Under this illustration, if an instrumentality used to cause death would not normally be used to cause death and the jury is instructed it can infer malice from the use of the instrument, the jury could draw an inference from the mere use of the instrument even though the actual surrounding evidence would not otherwise support malice. Thus, the instruction could be used by the jury as a substitute for a finding of malice based on the evidence.

*Id.* (citation omitted).

The facts before the court in *Ambrose* differed from the above hypothetical. In *Ambrose*, the defendant had "entered the house in violation of a no-contact order, and he was armed with a baseball bat and a pistol, which he repeatedly fired at occupants in the house, as well as one occupant outside the house who was attempting to run from the dwelling." *Id.* Under those circumstances, the trial court was justified in giving the inference instructions, which "did not present a danger that the jury could infer malice from underlying acts identified in the instruction that would not otherwise support the inference." *Id.* However, because a jury could make an inference of malice without support from the surrounding evidence in the hypothetical, the court advised that "the use of inference instructions generate concerns that must be carefully considered in each case." *Id.*

Green correctly argues his case is substantially similar to the *Ambrose* hypothetical—though we note there is no evidence Koster was winning the fight,

there is evidence Green was much larger than Koster, and there is evidence that Koster was not in good health.  We also agree the *Ambrose* court's discussion of that hypothetical deserves respect and consideration.  However, though there is some indication that inference instructions may be improper in some scenarios, the commentary cited did not affect the result in *Ambrose*.  We have no controlling precedent to adhere to since, to date, our supreme court has yet to find an inference instruction improper under an existing fact pattern rather than one hypothetically posed.  In contrast to the dicta Green relies on in *Ambrose*, we are confronted with clear, controlling authority that requires us to affirm the use of an inference instruction here.  As the *Ambrose* court noted,

> We have permitted the practice of instructing juries on inferences of malice from certain evidence since 1858.[1]  *See State v. Gillick*, 7 Iowa 287, 311 (1858) ("Malice is legitimately inferred from the weapon used and where the killing is with a dangerous weapon calculated to produce and actually producing death in the absence of proof that it was accidental or upon provocation the presumption of law is that the act is voluntary and with malice aforethought").  Inferences are a part of our law and the practice of identifying specific inferences that may be drawn from general categories of evidence gives the jury an important focal point and tightens the analysis to eliminate inferences not supported by the evidence.

*Id.* at 560-61 (citation omitted).

---

[1] The uniform inference instruction set out in Instruction No. 19 formerly included a caveat stating that the inference existed "in the absence of evidence to the contrary." *State v. Jeffries*, 313 N.W.2d 508, 509 (Iowa 1981).  The *Jeffries* court held the added language to be surplusage.  *Id.* at 510.  There is little discussion of the issue in *Jeffries*, but self-defense was a claim in *Jeffries*, and the *Jeffries* court apparently considered the added language redundant because of the State's obligation to prove an absence of self-defense.  *Id.* at 509-10.  The jury here was also instructed it was the State's burden burden to prove Green's acts were not justified by self-defense.  When the jury returned a verdict of guilty to second-degree murder, the issue of justification was negated. There was no contention the victim's death was an accident, and the jury was also instructed it was the State's burden to prove intent.

The inference of malice arises simply "from the intentional use of a deadly weapon in a deadly manner." *State v. Reeves*, 636 N.W.2d 22, 25 (Iowa 2001). A baseball bat qualifies as a dangerous weapon. *See State v. Hill*, 140 N.W.2d 731, 734 (Iowa 1966) ("It has been said, and we agree, that the character of a dangerous weapon attaches by adoption when the instrument is applied or is carried for use against another in furtherance of an assault."). It was used here in a deadly manner. Furthermore, malice may be implied. *See* Iowa Code § 707.1 (2011). The jury was told in Instruction No. 21 that malice "may be found from the acts and conduct of the defendant, and the means used in doing the wrongful and injurious act."[2] The acts and conduct of Green, without more, are adequate for a jury to find malice under Iowa law. *See State v. Lee*, 494 N.W.2d 706, 707-08 (Iowa 1993). The jury so found when it returned a verdict of guilty on the second-degree-murder charge.

There is no authority for the proposition that use of a weapon provided by the victim as a weapon of opportunity by the perpetrator—rather than its use as a weapon of choice provided by the perpetrator—invalidates the inference instruction. We, as well as the trial court, are bound to follow our supreme court's precedent. *See, e.g.*, *State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990). The trial court did not commit error in using the inference instructions, and accordingly, we affirm.

**AFFIRMED.**

---

[2] Green did not object and does not now contend that Instruction No. 21 is anything other than a correct statement of Iowa law.