### CARTER ROBERTS V. THE STATE.

*No. 3754.    Decided October 24.*

1. **Special Venire Ordered at a Term of Court Previous to Trial Term.**— At the January term of the court the cause was continued. Subsequent to the continuance, and during said term of court, an order was made by the court for a special venire returnable to the next succeeding term of the court, and at the same time the case was also set for trial on a specified day of said next term, and the writ for the special venire was issued in obedience to said order during said January term. *Held*, on motion to quash the special venire, because ordered and drawn at a term of court previous to the term at which appellant was tried, that the motion was properly overruled under the provisions of the statute, which declares, that "when there is pending in any District Court a criminal action for a capital offense, the district or county attorney may, at any time after indictment found, on motion either written or oral, obtain an order for a special venire to be issued in such cause." Code Crim. Proc., art. 606.

2. **Same—Time of Summoning Jurors—Statutes Directory.**—The time of summoning jurors, except so far as their own convenience is concerned, is immaterial, and can in nowise affect their official acts; and our statutes in regard to the mode and manner of summoning them are directory and not mandatory, and a liberal construction should be given these statutes.

3. **Objectionable Juror, Practice as to.**—The State and defendant having accepted the juror S. after a rigid examination on his *voir dire* as to his qualifications, afterward examined another juror, one P., and when the latter's examination was concluded the court remarked, "that as the juror when examined by defendant's counsel seemed to qualify himself, and when examined by the court seemed to qualify himself, and then seemed to be in doubt himself as to his ability to try the case without being influenced by his previous opinion, the court would excuse him." S., the former juror, who had heard P.'s examination and the court's remarks excusing him, then said to the court that he (S.) was in about the same condition as P., and would like to be excused. The court remarked that it was too late, as he had already been selected and impanelled. Defendant's counsel then remarked, that he was willing to excuse the juror S., to which the court replied it was now too late, as the juror had been chosen by both sides and impanelled. Defendant's counsel took no exception to the action of the court in refusing to excuse S., nor did he propose to challenge S., and S. remained upon the jury. It appeared that at the time S. was accepted as a juror defendant had exhausted less than six of his peremptory challenges, and that only seven peremptory challenges were exhausted by him in completing the jury. It was only after the verdict was returned that defendant's counsel excepted to the action of the court in refusing to excuse the said juror S. *Held*, no error; that defendant's simple suggestion to the court that he would agree to excuse the juror was not sufficient. If the juror was obnoxious to defendant he should have moved at once and promptly to set him aside.

4. **Abandonment of Difficulty—Right of Self-Defense.**—When the defendant, who was armed and in his own yard, accosted deceased and demanded an apology of him, which deceased refused to make, and a violent quarrel ensued, during which deceased left, went across the street to his own house, and in a short time returned to where defendant still remained standing in his yard, and the quarrel was resumed and ended in the shooting and killing of deceased by defendant; *held*, that there was no such abandonment of the difficulty by defendant as entitled him to an instruction in relation to his right of self-defense arising from abandonment of the difficulty.

5. **Same—Abandonment of Difficulty.**—An abandonment of a difficulty, which a party has provoked, in order to entitle him to have his perfect right of self-defense revived, must be such a one as clearly evinces a withdrawal in good faith, and shows by his acts his desire for peace.

APPEAL from the District Court of Dallas. Tried below before Hon. Chas. Fred. Tucker.

Appellant was indicted for the murder of one A. F. Jackson, by shooting him with a pistol. The result of the trial was appellant's conviction of murder in the first degree, with the penalty assessed at a life term in the penitentiary.

The rulings of the court on this appeal do not require a detailed statement of all the facts proved at the trial. The record is most voluminous, some forty-five witnesses having testified in the case.

The main contention of appellant, in so far as the testimony was concerned, relates chiefly to supposed errors and defects in the charge of the court, both upon the question of defendant's provoking the difficulty and the refusal of the court to give certain special requested instructions asked for by defendant with reference to his abandonment of the difficulty, and his right of self-defense as incident to such abandonment, and also a further special instruction as to his right of defense of his habitation.

Relative to these issues, we deem it only necessary to reproduce from the statement of facts the testimony of the State's witnesses Henry Stanks and Dan Wallace as given on their direct examination, and the testimony in chief of defendant's two most important witnesses, William Britton, Jr., and Betsy Willis, remarking, as to the testimony of these last witnesses, that in many important features the testimony was directly contradicted by evidence for the State, and in some of the main essential particulars testified about, the witnesses were impeached by proof of contradictory statements made to other witnesses introduced by the State.

Henry Stanks, witness for the State, being sworn, says: I am about 47 years old, and have lived in Dallas seventeen or eighteen years. I live on Peak Street, about four hundred yards north of where it crosses Flora Street. I have known defendant five or six years. I saw the shooting. I was looking back over my shoulder when it occurred. Roberts and Jackson lived on opposite sides of Flora Street. The east line of Roberts' lot is directly opposite the west line of Jackson's lot. Britton's house is ten feet west of Roberts' house, and they are both in the same yard—that is, there is no dividing fence between them. Roberts' house is on the south side of Flora Street, and Jackson's house is on the north side of the street. I had started to town in a wagon with my family, and as I was driving across Flora Street some one told me that Roberts and Jackson were "fussing" up there, and I stopped the

wagon and went up there. When I got to Jackson he was standing at Roberts' gate on the sidewalk outside of the fence with his right arm on the west post of the gate, and his face was to the east, toward Burford Street. Roberts was standing in or near the path which led from the gate to Roberts' house. Jackson was talking to Roberts across the gate with his face to the right. When I walked up I said to Jackson: "Is this you, Elder Jackson?" Jackson replied, "Yes." I said, "Come with me," and took hold of him and turned him to the left away from the gate. I then saw both of his hands and there was nothing in them, and we [he?] made no demonstration at any time. Mrs. Jackson took hold of Jackson's right arm and came in front of him, and said, "Turn my husband loose; I can manage him." And I did turn him loose, and in doing so shoved him to the right. I turned him loose because I saw danger, and jumped away two steps, and just then Roberts' pistol was fired. The reason I turned him loose and jumped back was because I saw that Roberts had a pistol and his hand extended. At the crack of the pistol Jackson fell. Roberts said, "Is he dead? If he is not dead, I will kill him;" and then it was that he fired the last three shots. I found one bullet hole and one other mark in the fence opposite where Jackson fell. Mrs. Jackson kneeled over Jackson's body and cried for help. I helped carry Jackson's body into the house and helped dress him. We found no pistol on his person. After the shooting Roberts told me he was powder-burned, and, throwing back his hair, asked me if I smelled powder. I told him that I smelled powder in the yard, but he was not powder-burned. When we were carrying Jackson's body in we had to wait at his door for some one to open it. It was opened from the inside.

Dan Wallace, a witness for the State, testified as follows: I was standing in Mr. Britton's door when the shooting occurred between Roberts and Jackson. Will Britton, Jr., and I were going somewhere that night, and I went over there to get him. I went in his room and sat down a while. He left the room ahead of me and went outside, and I was sitting in his room at the table. Will went to the front of the house, but I do not know where he went. I heard that Jackson and Roberts were fussing, and I got up and went to the front door of the house, and when I got there Roberts was asking Jackson for an apology, and Jackson said, "I will give an apology," in a bulldozing sort of a way. Then I heard Jackson say to Roberts that his wife was something, I don't remember what, and just then I heard two shots. I was standing in the front door looking at them. Well, I was not looking right at them, either. I was looking right out in front, and these men were right over to one side fussing. I did not see the flash of the pistol. These two pistol shots were almost right close together—almost too quick for one man to shoot. They went right off close together. I don't think I can pop my fingers as fast as they went. They just went

"bang! bang!" that way. I heard three slow shots right after these two. There were five shots in all, and there was a pause between the three last shots and the first two.

Will Britton, Jr., testified for defendant: "I am a son of William Britton, Sr., and reside at No. 232 Flora Street, between Peak and Burford. I know the defendant; he lived next door to my father, and first house east. I was at home the night Roberts shot Jackson. I am going on 20 years old now. I was standing on my father's front gallery, near a post, and heard the shooting. Mr. Jackson had been to our house for his children; he lived across the street from us. I told him his children were not at our house. He then started out at the gate, and Carter Roberts called him and asked him to make an apology or something. Jackson said something back to Roberts, and told him to wait till he came back. I didn't see Jackson after he went out of the gate. He went off somewhere and came back, and started in at Roberts' gate. It seemed like that when he came back they kept talking, and finally he got outside, and then the shooting commenced. The first blaze I saw was on the outside of the fence. I heard five shots. The first two were close together and the last three not so close. Roberts was in his yard. I have been working at Porter, Hopkins & Co.'s since October last. I can not relate the conversation that occurred between Roberts and Jackson that night. They were talking loud and right together, so much that I could not understand it. Carter Roberts was in his yard when he fired, right below his gate, toward Burford Street. I could see Roberts. He was in his shirt sleeves; he had on a white shirt. Jackson was on the outside of the fence, where the first shot came from. They were talking there for about five minutes.

Betty Willis testified for defendant as follows: I remember the night that Elder Jackson was shot. I was standing at Wiley's cross-fence at the time. I don't know exactly how long I had been there. Wiley's and Britton's yards were between me and Carter Roberts' gate. While standing there I heard Carter say, "Is that you, Elder Jackson?" Jackson said, "Yes." Carter said, "I would like to speak to you." Jackson said, "I have no speaking for you." Roberts said, "I would like for you to apologize." Jackson said, "I have no apology to make." Roberts said, "If you do not apologize you can apologize to my wife." Jackson said, "I have no apology to make to your wife, for I have nothing to apologize for." Roberts said, "For those remarks you made Sunday." Jackson said, "I made no remarks of or to your wife." Roberts said, "You did." Jackson said, "I will never apologize." Roberts said, "The name you called my wife is enough to apologize for." Jackson said, "I did not say anything." Roberts said, "You did." Jackson said, "You are a liar." Roberts said, "You are another liar." Roberts said, "You should not stand in my gate and call me a liar." Jackson said, "I have not got time to stand here and talk

to you.  I have got to go home." He went from there over home, and came back and called Carter Roberts out again. Jackson said, "Come out here and we will apologize with each other." Roberts said, "No; we can apologize from where we are." Jackson said, "I will never apologize." Roberts told him that he should apologize, and Jackson said "he had no apologies to make, as he had said nothing to apologize for," and then Roberts said, "You are a liar." Jackson said, "You are another liar." Then Roberts said, "You are another liar." And then the shooting commenced. The first shot was fired right from the line of the gate. Carter Roberts was in his yard, standing right between the little china tree and the fence. He was not very far from the gate, but I do not know exactly how far from the gate, inside, he was. I guess he was about as far from the gate as it is from here to that post yonder. Roberts was in his yard, and the first flash of the pistol was right in the gate. The next flash of the pistol was between the gate and the house. Carter Roberts fired the second shot. Roberts did not have on any coat, but he had on a white shirt, and he had on a vest. I did not take any notice of any lights in Carter Roberts' house. There were lights in Britton's house. I could just see a little white spot in front of Jackson, which I took to be a shirt bosom, and then I could see the pistol flash right from him. I could not see Jackson's person, but could just see the spot in front of him. Roberts was not in the gate, but the first shot came from right in the gate. Roberts did not shoot the first shot. I counted five shots. The first two shots were fired right together, and the last three shots just went, "dong! dong!" but they were not right together like the first two shots were. I saw Roberts standing at the little china bush in his yard. I witnessed the trouble between Roberts and Jackson two or three Sundays before that. I was in Carter Roberts' kitchen at the time, and had his child in my arms. I was not living with Carter at that time, but I had lived with him before that. They had just got through dinner when I came in. Carter ran in and said, "Where is my pistol? Where is my pistol?" His wife asked him what he wanted with it. Carter said, "That damned scoundrel has come in my yard to whip me." I did not see the beginning of this fuss, but I ran out there and said, "Why, Elder Jackson, is this you here?" Mr. Jackson said, "I have come here to ask him what remarks he has been making about me." I said, "Why, Elder Jackson, why don't you wait until to-morrow? This is Sunday." Jackson said, "No, I will never catch him to-morrow, and I just come over here to ask him about it, and he got mad." I told Elder Jackson that Carter might shoot him. He said that Carter could never pick up enough nerve to shoot him. I took him by the arm and said, "Come on, Elder Jackson, I do not want any shooting here. Mr. Britton is not here, and Mr. Wiley is not here." Elder Jackson said, "You

women are more excited than we men are." Elder Jackson was standing in Carter Roberts' yard then, near the work bench. He was about as far from here to that stove from the steps. I took hold of Jackson's right arm, and he said, "Mrs. Willis, I am not going to have any excitement. I am not going to raise any excitement at all." I told him not to. I said, "Go on to your church; your congregation is waiting for you, and here you are raising a fuss with Carter Roberts." He said, "I am not raising any fuss, but I am just asking him about the remarks he made." About this time Mrs. Jackson came out and said, "Let him alone, Mrs. Willis; I can manage him alone." And then she took him off. He went on across the street; then he hallooed back to Carter Roberts, and said, "I am a gentleman. My principle has been proved out from Washington City to Texas, and nobody can spot me." Roberts was still in the house looking for the pistol, and Mrs. Roberts was standing in the door. Mrs. Roberts said, "I don't know whether you are or not." Jackson said, "I am more than you are. You live in 'honky-tonks,' and you have a child by your wife's aunt, and I don't live as you do." I told Elder Jackson that he should not say that, as he had never seen her aunt, and he didn't know that, and I said, "If they should carry you to the court house, what would you say about that?" He said, "I would say that I heard it." He was talking to Carter Roberts' wife then. He said that he did not have a whore for a wife, neither did he live with his wife's aunt. When he said this Carter was still in the house looking for his pistol. Nobody took hold of Jackson but his wife. She came right out of her gate, came across to Carter's gate, caught hold of Elder Jackson, and took him to church. She had a big white pocket handkerchief with a pistol in it, and she handed it to Elder Jackson, and he put it into his pocket. I said, "Elder Jackson, don't shoot him." He said, "I am not going to shoot unless that scoundrel comes out here and meddles with me." I said, "Carter is not going to shoot, because he has not got any pistol." They went on to church then. I have been knowing Carter Roberts about thirteen years.

*Crawford & Crawford,* and *Watts, Aldredge & Eckford,* for appellant, contended: 1. That the action of the court in ordering the special venire and making it returnable to a succeeding term of court, and the drawing of said special venire, were absolutely void acts, because the court was without jurisdiction to make such order or have such drawing done. Code Crim. Proc., arts. 605, 606, 607, 609, 610. That the words, "at any time after indictment found," in article 607, mean at any time during terms after indictment found, is made manifest by articles 3035 and 3046, Revised Civil Statutes, because under these sections it is impossible to order the venire and have it drawn and issued

at a former term unless in a court where the terms run into each other, and when the Revised Statutes were adopted there was no such court in Texas. We are unable to cite a decision in point, for the reason, we submit, that this is the first order of this kind made by any court in any State of the Union.

2. That the court erred in failing to excuse the juror Scollard under the facts shown by their bill of exceptions (see facts with regard to this matter substantially stated in the syllabus, subdivision number 3); and in support of this ground of supposed error, appellant submits that he has not had the fair and impartial trial guaranteed to him by our Constitution. Bill of Rights, sec. 10; Hanks v. The State, 21 Texas, 526; Henrie v. The State, 41 Texas, 579; 1 Graham & Waterman on New Trials, pp. 373, 374, 385, 386, 406.

3. The court erred, in the fifteenth paragraph of the charge, with regard to defendant's provoking the difficulty. The true issue for the jury was whether appellant provoked the difficulty with intent to kill or do serious bodily injury which would probably result in death, or whether he provoked it simply with intent to ask and obtain an apology. Appellant was entitled to an affirmative charge on this phase of his defense. Appellant asked a special charge correcting these errors in the general charge, which was refused by the court. Willson's Crim. Stats., arts. 677, 678; White v. The State, 18 Texas Ct. App., 63; Irvine v. The State, 20 Texas Ct. App., 41.

4. Appellant by his special charge number 2 asked the court to instruct the jury, that if appellant provoked a difficulty and it had ended, and if deceased subsequently renewed it and became the aggressor, and if deceased was killed in such subsequent difficulty, then in that event appellant would not be deprived of his right of self-defense, which special charge was refused by the court. The court had wholly failed to charge on this branch of appellant's defense, and this special charge sought to correct this error of the court's charge. Willson's Crim. Stats. (Code Crim. Proc.), arts. 677, 678, and note 2338; Odle v. The State, 13 Texas Ct. App., 612; Rutherford v. The State, 15 Texas Ct. App., 236; Boren v. The State, 23 Texas Ct. App., 28; Roach v. The State, 21 Texas Ct. App., 249; Hor. & Thomp. Cases on Self-Def., note to Stoffer's case, p. 231.

5. The court failed to charge the jury as to appellant's right to defend his habitation, and appellant asked special charge number 1, covering this phase of the defense, which the court refused. Penal Code, arts. 572, 575; Weaver v. The State, 19 Texas Ct. App., 570; Richardson v. The State, 7 Texas Ct. App., 493.

*Stillwell H. Russell*, and *R. H. Harrison*, Assistant Attorney-General, for the State, filed an able brief and argument for the State.

DAVIDSON, JUDGE.—On the 28th day of January, 1891, this cause was continued for the term. The court adjourned for that term on the 4th day of April, 1891. The succeeding term of the court convened April 6. On March 30 the bill of exceptions recites that the court ordered a special venire to issue, returnable on April 9, and set the cause for trial the 13th day of April. The writ issued March 31, and was on same day delivered to the sheriff. The jurors drawn upon the special venire were selected from the jurors drawn by the jury commissioners for service during the April term of the court, at which term the defendant was tried. The writ and returns are not made parts of the record. Appellant's contention is that the action of the court in so ordering the special venire, and making it returnable to a succeeding term of the court, as well as the special venire itself, were absolutely void acts, because the court was without jurisdiction to make such order or have such drawing done. The defendant's motion to quash was filed at the April term of the court.

This is a question of first impression in this State, and counsel have cited us to no authority that throws any light on the matter at issue. We must look, then, in the main, to our statutes for a solution of the question. By the statute a "special venire" is defined to be a "writ issued by order of the District Court, in a capital case, commanding the sheriff to summon such a number of persons, not less than thirty-six, as the court in its discretion may order, to appear before the court on a day named in the writ, from whom the jury for the trial of such cases is to be selected." Code Crim. Proc., art. 605. It is also provided, that "when there is pending in any District Court a criminal action for a capital offense, the district or county attorney may, at any time after indictment found, on motion either written or oral, obtain an order for a special venire to be issued in such case." Id., art. 606. Again, it is provided that "the defendant in a capital case may also obtain an order for a special venire at any time after his arrest upon an indictment found, upon motion in writing, supported by the affidavit of himself or counsel, stating that he expects to be ready for trial of his case at the present term of the court." Id., art. 607. This article was added in the revision of our criminal procedure in 1879. "The order of the court for the issuance of the writ shall specify the number of persons required to be summoned and the time when such persons shall attend, and the time when such writ shall be returnable, and the clerk shall forthwith issue the writ in accordance with such order." Id., art. 608. By further provision of the statute, "a capital case may, by agreement of the parties, be set for trial or disposition for any particular day of the term with the permission of the court; or the court may at its discretion set a day for the trial or disposition of the same; and the day agreed upon by the parties or fixed by the court may be changed and some other day fixed should the court at any

time deem it advisable." Id., art. 609. "Whenever a special venire
is ordered, all the names of the persons selected by the jury commis-
sioners to do jury service for the term at which such venire is required
shall be placed upon tickets of similar size and color of paper, and the
tickets placed in a box and well shaken up, and from this box the clerk
in the presence of the judge, in open court, shall draw the number of
names required for such special venire, and shall prepare a list of such
names in the order in which they are drawn from the box, and attach
such list to the writ and deliver the same to the sheriff." Id., art. 610.
Before the defendant can be brought to trial in a capital case, he has
the right to have one day's service of a copy of the names of the per-
sons summoned under the special venire to try him, except when he
waives it, or is on bail, etc. Id., art. 617.

Statutes directing the mode of proceeding by public officers are di-
rectory, and are not to be regarded as essential to the validity of the
proceedings themselves unless so declared in the statutes. Pocket v.
The State, 5 Texas Ct. App., 552; Murray v. The State, 21 Texas Ct.
App., 466; Railway v. Dunlavy, 56 Texas, 256; People v. Cook, 14
Barb., 259, 290; Holland v. Osgood, 8 Vt., 280; Corliss v. Corliss, Id.,
373; Ex Parte Holding, 56 Ala., 458; Suth. Stat. Con., sec. 451; Thomp.
on Trials, sec. 15. It has been said that "the provisions of the statute
requiring that grand jurors should be summoned at least five days
before the first day of the court to which they may be summoned is
manifestly directory to the sheriff, and for the convenience of the jurors,
that they may have sufficient notice, of the service required of them;
and though it may be true that a juror could not be compelled to at-
tend unless so summoned, yet if he thinks proper to attend and serve
without such notice it constitutes no objection to the regular organi-
zation of the grand jury. The time of summoning jurors, except so far
as their own convenience is concerned, is quite an immaterial thing,
which could in nowise affect their official acts. And so of other de-
partures from the letter of statutes relating to obtaining jurors." Mur-
ray v. The State, 21 Texas Ct. App., 466; Suth. Stat. Con., sec. 449;
State v. Gillick, 7 Iowa, 287; State v. Smith, 67 Me., 328; Heucke v.
Railway, 69 Wis., 401; Birchard v. Booth, 4 Wis., 67. A statute re-
quiring a court on the first day of the term to assign cases for trial on
particular days was held directory. People v. Doe, 1 Mich., 451. And
it has been universally held that "a statute specifying a term within
which a public officer is to perform an act regarding the rights and
duties of others is directory, unless the nature of the act to be per-
formed or the phraseology of the statute is such that the designation
of time must be considered as a limitation of the power of the officer."
Suth. Stat. Con., sec. 448. If the element of time enters into the con-
struction of articles 607 and 608, they are certainly directory in so far

as that question is concerned. In People v. Allen, 6 Wendell, 486, Marcy, J., says: "The general rule is, that where a statute specifies the time within which a public officer is to perform an official act regarding the rights and duties of others it will be considered as directory merely unless the nature of the act to be performed or the language used by the Legislature shows that the designation of the time was intended as a limitation of the power of the officer." In State v. Lean, 9 Wisconsin, 279, the rule of construction was thus declared: "Where there is no substantial reason why the thing to be done might not as well be done after the time prescribed as before, no presumption that by allowing it to be so done it may work an injury or wrong, nothing in the act itself or in other acts relating to the same subject matter indicating that the Legislature did not intend that it should rather be done after the time prescribed than not to be done at all, then the courts assume that the intent was that if not done within the time prescribed it might be done afterward." The State v. Smith, 67 Me., 328; 20 Iowa, 22; 24 Ill., 108.

In the authorities quoted it is manifest that time entered into the statutory provisions as an element, and provided that the specified acts were to be performed within a designated time, and under the terms of those statutes the time of performance was abridged; and in so far as they affected the rights of parties, the remedies set out, and privileges granted therein to them, they were also abridged. But in the statutes quoted from the Code of Criminal Procedure the time is not abridged, in so far as the State is concerned. Time does not enter into the provisions of article 607. The language is: "The district or county attorney may, at any time after indictment found, * * * obtain an order for a special venire to be issued in such cases." This statute is the opposite of the statutes commented on in the authorities cited. The articles quoted from the procedure were enacted for the purpose of enforcing the provision of the Bill of Rights which guarantees to persons accused of crime a speedy trial before a fair and impartial jury, and of benefiting the defendant in his trial and extending to him larger privileges than he before enjoyed in such cases. At common law he had no such privilege. Without a statute regulating the procedure in such cases we would be relegated to the common law for the rule. Our statute, then, is an innovation on and change of the common law, and conceived alone for the benefit of the accused. The statute originated in the idea, and from the fact, that under the common law system the sheriff, coroner, or other official authorized to summon "good and lawful men," did not always obey the command of the writ to summon the specified character of veniremen, and the practices of these officials led to enormous abuses, chiefly in the packing of juries and in the blackmailing of citizens. Thomp. on Trials, sec. 13; Rex v. Whitaker, Cowp., 752.

To remedy these abuses, the States of the Federal Union have generally provided with more or less particularity for the preparation, a given time before the commencement of the term of court, or at stated periods, of a list of persons within the county or other jurisdiction from whom jurors are to be summoned. Same authority. "In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury. The Legislature shall pass such laws as may be needed to regulate the right of trial by jury, and to maintain its purity and efficiency." The officers charged with the enforcement of the laws are expected and required to be diligent in their duties in these respects, having due regard always for the rights of the citizen who may be charged with crime.

Delay is not intended to enter into nor comprise any part of the procedure in criminal actions under our bill of rights or criminal procedure in so far as the prosecutions are concerned. Looking to the provisions of our criminal procedure, every facility is intended to be afforded the State, in accordance with and in obedience to the high commands of the Bill of Rights, to try criminal causes at the earliest date possible. To this end a liberal construction is required to be given the provisions of the Code of Criminal Procedure, so as to attain the objects intended by the Legislature—the prevention, suppression, and punishment of crime. Code Crim. Proc., art. 26. The State is presumed to be ready to try criminal causes when the prosecution is commenced. It is not to be presumed that the officers of the State would inaugurate frivolous or willful prosecutions, nor that prosecutions would be begun with the ultimate expectation of securing evidence by which the cause could be sustained. If we are correct in our views as to the reasons for the passage or enactment of the statutes under consideration, one of the principal objects to be attained thereby was the protection of a party accused of a capital felony in his right of trial by an impartial jury. These statutes grant him privileges not heretofore enjoyed. While he is secured in his right of trial by an impartial jury by the Bill of Rights, yet the manner of securing that valuable right and the procedure relating thereto is relegated to the Legislature, and by their will the courts must be governed in enforcing these provisions. The privileges are sought to be adjusted to the different grades of offenses, as was thought to be just and proper by the law making power. The party accused of a capital felony has privileges given him in a jury trial not accorded the party accused of a noncapital crime, and the party accused of a noncapital felony has privileges in the matter of juries that are not accorded to a party prosecuted for a violation of misdemeanor statutes. It would seem, therefore, that the party prosecuted for crime can not require more than is accorded him in these matters by the statute, and that his rights and remedies are measured by the legislative enactments in relation to the manner of selecting,

summoning, and impanelling the jury by which he is tried. On the other hand, he can not complain that more privileges have been given him by the court than the statute accords him. He can not, therefore, object that the list of persons summoned to try him was served on him a longer period before the trial than was required by the statute. Thomp. on Trials, sec. 18, notes 1–6.

The element of time does not enter into article 607 of the Code of Criminal Procedure, unless it be taken in connection with the various articles quoted above, and then only to the extent of requiring the venire to be drawn, summoned, and served upon the defendant in time for him to prepare himself intelligently, and with safety to himself, to pass on the names served upon him from whom he is to select the jury to sit in judgment on the issues of his case. It could be no objection to the venire that it was demanded a longer time before his trial than was actually necessary in order to give him one day's service of the copy of the names summoned, for that would redound to his benefit, and could not injure him nor tend to trench upon his rights to secure his trial before an impartial jury.

The comprehensive idea underlying the ordering, drawing, and service of a special venire is, that it is a privilege granted a defendant on his trial looking to a fair trial before an impartial jury. It is a remedy that is intended to guard every avenue that would lead to wrong or oppression in the selection of the jury which is to try him, and to afford him every facility of securing a fair trial before such jury. The longer the opportunity is afforded for investigating the jurors so summoned, the more carefully are the interests of the defendants guarded. The State can demand the venire "at any time" in such cases after indictment found. Suppose this is not done, then the privilege is accorded a defendant to call for such venire, so that he is not left without remedy. He can, by complying with the terms of the statute, himself obtain an order for the special venire, and thus force a trial of his cause. Article 607 uses no ambiguous language, and leaves but little room for construction. That the jurors to be drawn on the special venire shall be drawn from the jury selected for the given term would not affect the order for the special venire entered at the previous term.

Orders are not unfrequently made to take effect at a future or a subsequent term of the court, and for that reason are never considered void or illegal. Such has been the practice of courts from time "whereof the memory of man runneth not to the contrary," and is in many instances to be commended. It is a practice familiar to all courts and sanctioned by them, and not contrary to good conscience. One of such rules of practice familiar to courts and the profession is the setting of cases for a particular day at a succeeding term of the court, and auxiliary to the trial of such cases is the practice of taking

all necessary orders preparatory to such trials at the specified date. It would be unfortunate that such rules should be abrogated or discarded. It would lead to great inconvenience, at the least, if not to more serious consequences. Such a rule has been found of great value to courts and attorneys, and therefore to litigants, and is a rule, so far as we know, never questioned in or by the courts of this country. In order, then, to hold the order entered by the court complained of by the defendant void, we have, first, to hold the statute (article 607) mandatory; and secondly, that the term "at any time" means a particular term of the court; in the third place, such a construction would abridge the rights and privileges of the defendant, whereas the statute was intended to enlarge them; and in the fourth place, it would give a strained and an unnatural construction to the language, and thereby ingraft upon it a meaning and an intention that, under the authorities quoted and the language employed by the statute, is entirely foreign to it, and contrary to its plain import and terms. The order entered by the court, and complained of, as we understand the law, is not void. As we understand the statutes quoted, and the legislative mind therein manifested, we are of opinion that the court did not err in this matter as contended by appellant.

It is not necessary to view the question from the standpoint of injury, as that question is not raised, but we will here remark that no injury is shown. The contention is that the order was void, and therefore the special venire actually summoned was not a legal venire and should have been vacated. In this we can not concur with appellant.

In so far as the juror Scollard is concerned, it is sufficient to say that defendant accepted him and retained him. He was not forced upon the defendant, nor did he seek to have the juror set aside when it was ascertained that there was a possibility of his being prejudiced against him. His simple suggestion to the court that he would agree to excuse the juror was not sufficient. If the juror was obnoxious to defendant, he should have moved at once, and promptly, to set him aside, if the legal grounds therefor existed. Willson's Crim. Stats., sec. 2293, for collated authorities. There was no bill of exceptions taken or reserved in this matter until after the trial of the cause and verdict returned into court.

The defendant asked the court to charge the jury, "that if he provoked a colloquy with the deceased for the purpose of obtaining an apology, and if said colloquy ended, and if subsequently deceased himself renewed the difficulty and became the aggressor, and in said subsequent difficulty was attempting to take the life of defendant when defendant fired the pistol shot, then you will find the defendant not guilty." The theory of the State made by the evidence was that the killing was upon express malice. By the evidence the State showed that the defendant prepared himself and brought on the difficulty for

the purpose of killing deceased, and also prepared for the subsequent theory of self-defense, and this in advance of the difficulty. Looking to these objective points, defendant sought the difficulty and produced the occasion for the killing and for bringing on the original difficulty which ultimately ended in the killing of deceased. Pending the difficulty, the defendant proved that the deceased left it a very short time · and returned. Upon his return he informed the defendant that he was then ready to apologize. This is the evidence as to abandonment and renewal of the difficulty. The tone of voice of the deceased was said to be that of defiance. A few words were spoken, each accused the other of lying, and then the firing began, which terminated in the death of the deceased. Defendant introduced evidence to the effect that deceased fired the first shot, and only one shot. Defendant fired four shots, three of them after deceased was lying prostrate on the ground. The State's evidence shows that the deceased did not shoot at all at any time, and that he at no time had a pistol. The court, under this state of case, charged the jury fully as to the law of self-defense, both as to real and apparent danger. These charges were, in substance, that if deceased fired at defendant, or if he was attempting to use deadly weapons on defendant at the time the defendant shot him, then in either event they should acquit the defendant. The defendant is entitled to every theory of self-defense made by the facts. When such theories have been given in charge, the demands of the law are satisfied. If defendant was shot at by deceased, as he contends, and he then shot and killed the deceased, the law would justify the killing. If the deceased was attempting to shoot the defendant, and under this state of case defendant shot the deceased, he would be justified, and in either event he would be entitled to an acquittal, provided he was free from wrong himself. The court charged fully upon these phases of the case.

The court also charged the law bearing upon provoking the difficulty with the deceased on the part of the defendant. Having given this charge, it is contended by appellant that the court should have charged upon abandonment of the difficulty by the defendant, and the subsequent renewal of the same by the deceased. In support of this proposition, we are cited by appellant's brief to the testimony of the witnesses Britton, Wallace, Willis, and Shirley. Britton testified, that as deceased "started out at the gate, Carter Roberts called him and asked him to make an apology or something. Jackson said something back to Roberts, and told him to wait till he came back. I didn't see Jackson after he went out the gate. He went off somewhere, and came back, and started in at Roberts' gate. It seemed like that when he came back they kept talking, and finally he got outside, and then the shooting commenced." Wallace testified: "I heard that Jackson and Roberts were fussing, and got up and went to the front door of the house, and when I got there Roberts was asking Jackson for an apol-

ogy; and Jackson said, 'I will give an apology; I will give an apology,' in a bulldozing sort of way. Then I heard Jackson say to Roberts that his wife was something, I don't remember what, and just then I heard two shots." Willis testified: "I heard Carter say, 'Is that you, Elder Jackson?' Jackson said, 'Yes.' Carter said, 'I would like to speak to you.' Jackson said, 'I have no speaking for you.' Roberts said, 'I would like for you to apologize.' Jackson said, 'I have no apology to make.' Roberts said, 'If you do not apologize, you can apologize to my wife.' Jackson said, 'I have no apology to make to your wife, for I have nothing to apologize for.' They continued to quarrel until they called each other liars. Roberts then said, 'You should not stand in my gate and call me a liar.' Jackson said, 'I have not got time to stand here and talk to you; I have got to go over home.' He went from there over home, and came back and called Carter Roberts out again." They began to quarrel again, and continued it until they gave each other the lie, whereupon the shooting began. During the quarrel the parties were at or near Roberts' yard gate, to which Roberts had called Jackson, the deceased. "Jackson was standing right in front of Roberts' gate, and then Jackson went on over to his house, and Carter Roberts staid right where he was at the corner of his house. He did not leave that place. I never saw Carter Roberts go into his house. Jackson went on to his house, and I do not know where he crossed the street, as I could not see him out in the street, and I did not see him go across the little bridge up by his house, but I saw him when he went out of Carter Roberts' gate. Jackson said he would have to go and get his overcoat. I heard him when he came back there. He had on a black coat when I first saw him. When he came back he had on a big black coat, but I do not know whether it was an overcoat or not. They were talking again when Jackson came back, but they did not have as long a talk then as they did the first time. When Roberts first spoke to Jackson he went into his house, and came out, and then he and Jackson quarreled until Jackson went across the street and returned. Upon his return Jackson invited Roberts out into the street." Shirley testified, that "I was at my house when it started. I heard some one say, 'You owe me an apology.' When I heard this I came to the door to see what it was, as I thought some one was fussing out there. I then saw Carter Roberts standing on his porch, and saw Jackson standing at Carter Roberts' gate." This witness also detailed the remarks by the quarreling adversaries. Jackson invited Roberts out several times, and he finally went out to the gate where Jackson was, whereupon the firing began. This witness did not see Jackson go across the street and return to Roberts' house. Roberts told one witness prior to the killing, that "he was going to kill Jackson in self-defense." To another he "showed his pistol, and

said that he was going to do Jackson up." To another he said, after the killing, that "he was sorry—he had to kill in self-defense."

The evidence is uncontradicted that Roberts provoked the difficulty in the first place. Do the facts above quoted show an abandonment of the difficulty by appellant, or do they raise that issue? In Brazzil's case, this court said: "It is a general and well established rule of law that 'a conflict provoked by a defendant can not be set up by him as a defense' (Whart. on Hom., sec. 482), and that where a defendant by his own wrongful act has brought about the necessity of taking life, he can not plead that such killing was in his necessary self-defense." 28 Texas Ct. App., 586; Gilleland v. The State, 44 Texas, 356; Willson's Crim. Stats., sec. 1070. "But it is a rule, equally as well settled and established, that 'though the defendant may have thus provoked the conflict, yet if he withdraws from it in good faith and clearly announces his desire for peace, then if he be pursued his right of self-defense revives.'" Brazzil v. The State, 28 Texas Ct. App., 587; Whart. on Hom., sec. 483; The State v. Partlow (Mo. Sup.), 4 S. W. Rep., 15. "The further rule is laid down in Stoffer's case, 15 Ohio State, 47, that the conduct of the accused relied on to sustain such a defense, of justifiable homicide, must have been so marked in the matter of time, place, and circumstances as not only clearly to evince the withdrawal of the accused in good faith, but such also as fairly to advise his adversary that his danger had passed, and make his conduct thereafter the pursuit of vengeance rather than measures taken to repel the original assault." Brazzil v. The State, 28 Texas Ct. App., 587.

It is evident from the record that appellant provoked the original contest for the purpose of bringing about a deadly conflict. Such is the effect of all the evidence relating to the first part of the difficulty. Appellant contends, giving the most favorable construction to his theory of this case, that the deceased during the difficulty left the scene thereof, went across the street, armed himself with a pistol, returned to where appellant was, and invited him to come to where he was for the purpose of further prosecuting the difficulty which ended in the death of deceased. Appellant remained at the place where deceased left him awaiting his return, and promptly on his return carried on the same character of difficulty with deceased as previously begun by him, and did not desist until he had killed deceased. If deceased invited appellant to remain at the position he then occupied until he could arm himself and return to the scene of the difficulty, and he did so remain and immediately re-engaged in the contest, can it be said that he had abandoned such contest? What act of appellant's notified deceased that he had abandoned the difficulty? What act or expression on the part of the appellant signified his intention to abandon the contest? He remained in the same position in which deceased left him when he went across the street to his home and returned. In that position he awaited

the return of his antagonist, and upon his reappearance the difficulty went on as begun. Under the theory advanced arising from the departure and return of the deceased to the scene of the homicide, if he went for his pistol, there is nothing to indicate that appellant had abandoned the contest, or that he conceived the idea that deceased had done so.

On the contrary, it is contended that deceased was pushing the difficulty to its utmost and had armed himself for that purpose, and had so notified appellant, who awaited, without moving from his position, the return of his foe. What fact, circumstance, or act was there on the part of appellant that indicated in any manner that he had withdrawn from the action? Does the fact that he was in his own yard, and refused to leave it, "evince his withdrawal" from the contest? Certainly not, because he was in his own yard when he in the first instance accosted deceased, who was passing from a neighbor's along the street, and never left it at any time. After first accosting deceased, appellant went into his house, came out again, and remained about stationary until the return of his adversary; whereupon he went out to the gate where he was, and killed him. He must not only have clearly evinced to the deceased his withdrawal from the action in good faith, but his conduct must have been, as to "matter of time, place, and circumstance," "also as fairly to advise his adversary his danger had passed, and make his conduct thereafter the pursuit of vengeance rather than measures taken to repel the original assault." If defendant had indicated his intention of abandoning the difficulty, so that his adversary so understood it, it might have raised the necessity for a charge on this phase of the case. But this was not done. To make the most of the invitation of the deceased to the appellant to await his return from home, it was but a challenge to him to continue the difficulty already begun by appellant. "This condition placed the matter entirely under the control of the" appellant. This discretion on his part was exercised so as to continue the difficulty, and his silence and actions taken together did not indicate an abandonment. Under the evidence, there was no abandonment of the original difficulty, and there was no such separation of the parties during same as would indicate it on the part of either party. As we understand the facts, the appellant did not, in fact nor in intent, abandon the difficulty at any stage of the same.

The judgment is affirmed.

*Affirmed.*

Hurt, J., absent.